# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TANNEN SOOJIAN,<br><br>   Petitioner,<br><br>  v.<br><br>JOE A. LIZARRAGA,<br><br>   Respondent. | Case No. 1:16-cv-00254-AWI-SAB-HC<br><br>FINDINGS AND RECOMMENDATION RECOMMENDING DENIAL OF EXHAUSTED CLAIMS IN PETITION FOR WRIT OF HABEAS CORPUS |

   Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

## I.

## BACKGROUND

   On May 21, 2012, Petitioner was convicted after a second jury trial in the Fresno County Superior Court of: two counts of kidnapping to commit robbery (counts 1, 4); second-degree robbery (count 3); and assault with a firearm (count 5). (3 CT[1] 630–31, 640–43). The jury also found true several enhancements, including: intentional discharge of a firearm causing great bodily injury (counts 1, 3); personal infliction of great bodily injury (counts 1, 3, 5); and personal use of a firearm (count 4). (3 CT 630–31, 640–43). The jury found Petitioner not guilty of the

---

[1] "CT" refers to the Supplemental Clerk's Transcript on Appeal lodged by Respondent as Document Nos. 3–6 on May 20, 2016. (ECF No. 21).

other count of assault with a firearm (count 6) and was unable to reach a verdict on the attempted murder charge (count 2). (3 CT 644; 25 RT 6175–77, 6183).

The trial court sentenced Petitioner to two consecutive indeterminate terms of life with the possibility of parole for the kidnapping counts, plus consecutive terms of twenty-five years to life and ten years for enhancements on these counts. (4 CT 1088). A concurrent term of three years was imposed on count 5, plus four years for an enhancement thereto. (4 CT 1090). The sentence on count 3 and the remaining enhancements were stayed. (4 CT 1088, 1090).

On December 19, 2014, the California Court of Appeal, Fifth Appellate District affirmed the judgment. People v. Soojian, No. F066280, 2014 WL 7340275, at *28 (Cal. Ct. App. Dec. 19, 2014). The California Supreme Court denied Petitioner's petition for review on May 11, 2015. (LDs[2] 41, 42).

On February 22, 2016, Petitioner filed the instant federal petition for writ of habeas corpus in the Sacramento Division of the United States District Court for the Eastern District of California. (ECF No. 1). On February 23, 2016, the matter was transferred to the Fresno Division. (ECF No. 5). In the petition, Petitioner raises the following claims for relief: (1) jurors improperly considering evidence not presented during trial; (2) denial of right to trial by impartial jury; (3) jurors improperly discussed and considered Petitioner's failure to testify; (4) Miranda error; (5) erroneous admission of third-party misconduct evidence; (6) prosecutorial misconduct by improperly using evidence of third-party misconduct to support an inference of guilt by association; (7) denial of Petitioner's right to presumption of innocence by various and cumulative prosecutorial errors; (8) admission of tainted eyewitness identification evidence, in violation of due process; and (9) cumulative errors. (ECF No. 1 at 3–4).

On May 19, 2016, Respondent filed an answer. (ECF No. 20). On January 3, 2017, Petitioner filed a motion to stay the petition pending exhaustion of claims 7 and 9. (ECF No. 36). On June 7, 2017, the Court denied the motion to stay and allowed Petitioner to proceed with the exhausted claims of the petition. (ECF No. 42). Petitioner filed a traverse on July 6, 2017. (ECF No. 44).

---

[2] "LD" refers to the documents lodged by Respondent on May 20, 2016. (ECF No. 21).

1    Subsequently, Petitioner filed a notice of interlocutory appeal of the Court's June 7, 2017

2    order denying the motion to stay. (ECF No. 47). The Ninth Circuit dismissed the notice of

3    interlocutory appeal for lack of jurisdiction on February 27, 2018. (ECF No. 50).

## II.

## STATEMENT OF FACTS[3]

### Prior Proceedings in this Court

This is Soojian's third appeal to this court. As will be explained in greater detail below, the pickup Soojian's cousin, Aaron Bolin, owned at the time of the offense was located and searched after the first trial. Some incriminating evidence was discovered in the vehicle. In the first appeal (*People v. Soojian* (Mar. 16, 2009, F053842) [nonpub. opn.] ) we held the trial court applied the wrong standard of review when reviewing Soojian's motion for a new trial based on this newly discovered evidence.

After remand, the trial court again denied Soojian's motion for a new trial. In the second appeal (*People v. Soojian* (2010) 190 Cal.App.4th 491) we concluded the newly discovered evidence required reversal of the judgment and a new trial.[4] This appeal is from the judgment after the second trial.

### The Information

The fourth amended information charged Soojian with (1) kidnapping Joyce Ahumada to commit another crime (Pen.Code, § 209, subd. (b)(1))[5] (count 1); (2) the attempted murder of Joyce (§§ 664, 187, subd. (a)) (count 2); (3) second degree robbery of Joyce (§ 211) (count 3); (4) kidnapping Morgan Ahumada to commit another crime (§ 209, subd. (b)(1)) (count 4); (5) assaulting Joyce with a firearm (§ 245, subd. (a)(2)) (count 5); and (6) assaulting Morgan with a firearm (*ibid.*) (count 6).[6] Counts 1, 2, and 3 alleged Soojian personally discharged a firearm within the meaning of section 12022.53, subdivision (d) and personally inflicted great bodily injury within the meaning of section 12022.7, subdivision (a). Count 4 alleged Soojian personally used a firearm within the meaning of section 12022.53, subdivision (b). Counts 5 and 6 alleged Soojian personally used a firearm within the meaning of section 12022.5, subdivision (a).

### Victim Testimony

Joyce and her son, Morgan, were delivering the local newspaper early in the morning of Sunday, April 18, 2004, in a rural area of Fresno County. While Fresno was stopped on Shaw Avenue, a white truck passed her vehicle. The driver of the truck looked towards Joyce and Morgan as he passed them. Joyce next noticed the white pickup when it appeared behind Joyce's vehicle. The truck was being driven erratically, but Joyce concentrated on delivering newspapers.

The pickup slowly passed by Joyce's vehicle when she stopped to allow Morgan to deliver a newspaper. Joyce was not alarmed by the slow speed of the pickup

---

[3] The Court relies on the California Court of Appeal's December 19, 2014 opinion for this summary of the facts of the crime. See <u>Vasquez v. Kirkland</u>, 572 F.3d 1029, 1031 n.1 (9th Cir. 2009).

[4] Soojian's petition for writ of mandate (case No. F063306) also was granted to prevent the prosecutor from attempting to reinstate the allegations that the victims were kidnapped for the purpose of rape, oral copulation or sexual penetration. These charges were dismissed before the matter went to the jury in the first trial. We concluded the attempt to reinstitute these charges violated Soojian's right to be free from double jeopardy.

[5] All further statutory references are to the Penal Code unless otherwise stated.

[6] We will refer to Joyce and Morgan by their first names to ease the reader's task. No disrespect is intended.

because they were approaching an intersection controlled by a stop sign. Instead of proceeding through the intersection, the pickup backed up slowly, stopping when the front passenger door of the pickup was aligned with the front driver's door of Joyce's vehicle. The perpetrator leaned across the front seat of his vehicle to talk to Joyce through the passenger window of the pickup. He asked Joyce if she could direct him to Clovis. Joyce had a difficult time hearing over the noise of the pickup's engine, so the perpetrator got out of his pickup and walked up to the driver's side window of Joyce's vehicle. He was stocky, clean cut, and was wearing tight pants and a white T-shirt with buttons. Joyce did not feel threatened because the perpetrator was polite and nonthreatening.

While the perpetrator was talking to Joyce, he pulled out a handgun and pointed it at Joyce's head. He said "We're here to rob you." When Morgan kept staring at the perpetrator, the perpetrator became irate and yelled at Morgan to stop looking at him. Joyce told Morgan to retrieve her wallet from the glove box and to give it to the perpetrator, which was accomplished. The perpetrator looked around and then ordered Joyce out of her vehicle. When Joyce was out of the vehicle, the perpetrator walked her to the passenger side and ordered Morgan out of the vehicle.

The three walked towards the perpetrator's pickup, where the perpetrator ordered Morgan to get into the bed of the pickup. When Morgan did not know how to do so, the perpetrator provided instruction. The perpetrator then ordered Joyce into the cab of the pickup. He ordered Joyce to get on her knees in the front passenger well, which caused her to face the back of the pickup. The perpetrator then climbed into the pickup through the passenger door and climbed over Joyce towards the driver's seat. Joyce's face was against the seat while the perpetrator climbed over her. When his crotch was touching the back of Joyce's head, the perpetrator paused. Joyce testified she could feel the perpetrator's erect penis against the back of her head. The perpetrator pulled himself into the driver's seat and began fidgeting with the column gearshift. He then ordered Joyce to move next to him.

The perpetrator began driving forward. At this point Joyce decided she had to fight for her life and the life of her son, so she began screaming and attempted to pull the keys out of the ignition. She also grabbed the automatic transmission shift lever. The perpetrator yelled at her to stop fighting and began hitting her with the gun, causing cuts on her head. Joyce continued to grab whatever she could to stop the truck, and finally the perpetrator said if she did not stop he would shoot her. Joyce opened the passenger door to escape. As she was jumping out of the pickup, the perpetrator shot her in the chest. Joyce described the gun as a long-barreled revolver. She also testified there were two shots, one right after the other. Joyce continued to run away and yelled at Morgan to get out of the pickup. Morgan climbed out of the pickup just as the perpetrator sped from the scene. Morgan ran to Joyce's pickup to retrieve his cell phone, and Joyce ran to a customer's house to seek help.

Defense counsel focused on the inconsistencies between the various statements Joyce gave to law enforcement, her testimony at the preliminary hearing, her testimony at the first trial, and her trial testimony. Defense counsel pointed out that Joyce did not tell anyone in her statements the white pickup first passed her going in the opposite direction and the perpetrator stared at her as he did so. Nor did she mention the truck being driven erratically behind her in the first two interviews, although she mentioned it in a third interview. Nor did she mention the perpetrator wore tight pants in the first three interviews.

4

Morgan testified to the events in a manner that was similar to his mother's testimony until the point in time when Morgan was ordered to climb into the bed of the perpetrator's pickup. At that point he could not see what happened in the cab. He heard his mother screaming, two gunshots, and then saw his mother after she ran from the cab and helped him escape from the bed of the pickup. Important points he added to his mother's testimony included that the perpetrator was significantly taller than his mother, and there was a portable metal toolbox in the bed of the pickup. Morgan told the responding deputy sheriffs that he heard one gunshot.

### Identification Testimony
The defense acknowledged that Joyce and Morgan were put through a horrible experience, but claimed Soojian was not the perpetrator.

To summarize the events, law enforcement officers initially obtained a description of the perpetrator from Joyce and Morgan. Evidence at the scene of the crime led the investigating detectives to suspect Soojian was the perpetrator. A photo lineup (six pack) was prepared, which included Soojian. Morgan was unable to identify the perpetrator in the lineup, but Joyce identified Soojian as the perpetrator, as she did at trial.

Defense counsel focused on the description Joyce gave to the investigating detectives. She described the perpetrator as a White male, 38 to 45 years of age, about five feet four inches tall with thinning brown hair, wearing a white T-shirt, and nice looking and clean cut. She did not state the perpetrator was clean shaven; nor did she say he had a goatee. In a second interview she described the perpetrator as a White male, 35 to 40 years old, stocky, five feet four inches tall with short reddish hair, and wearing a white T-shirt with a few buttons. Joyce did not tell the detectives in this interview the perpetrator had a goatee. She testified in the first trial the perpetrator did not have a goatee. In the second trial, however, Joyce was certain the perpetrator had a goatee. She did not say in the first or second interview the perpetrator had a sunburned face.

Morgan, who is five feet eight inches tall, testified the perpetrator was taller than he. He also stated the perpetrator had a goatee.

Defense counsel questioned Joyce about her identification of Soojian in the photo lineup. In the first trial, Joyce testified she was presented the lineup for identification when she was recovering from the anesthesia after surgery, or, in her words, when she "started getting coherent." She was not given any directions (or an admonition) before she was shown the lineup. On redirect examination Joyce claimed she was read the standard admonition before she picked Soojian out of the photo lineup. She testified she had misunderstood the previous question.

### Description of the Perpetrator's Vehicle
Joyce testified the inside of the cab of the truck was messy (papers and stuff on the floor) and had an odor of stale cigarettes. The truck had a bench seat, although she could not recall if the truck had vinyl or cloth seats. She testified at the first trial she remembered the feel of the seat as being similar to vinyl. At the first trial Joyce was unable to identify a picture of the interior of Soojian's truck.

The recording of Morgan's phone call to the emergency operator was played for the jury. In this short conversation, Morgan described the perpetrator's vehicle as

a big white truck and described the perpetrator as a tall White male with a deep voice who was either in his late 20's or early 30's.

He also stated there was a rope, a horse halter, and a horse bridle in the bed of the perpetrator's pickup. Morgan identified items that law enforcement found in the bed of Soojian's pickup as the same items he had seen in the perpetrator's pickup. He also identified Soojian's truck as the vehicle the perpetrator was driving.

Cross-examination focused on the many inconsistencies between Morgan's statements to law enforcement, his testimony in the first trial, and his testimony at this trial. Morgan did not identify Soojian as the perpetrator in either trial, despite having told law enforcement he got a good look at the perpetrator.

### *Law Enforcement Testimony*

Deputy Sheriff Austin Herion was the first officer to arrive on the scene. He called for an ambulance and for assistance to secure the crime scene. He was not able to obtain any relevant information from Joyce because of her injuries. After the ambulance crew arrived, Herion attempted to locate evidence related to the crime. He located the blood trail Joyce had left in running from the street to the residence at which he found her. He also located the document that led the investigating detectives to identify Soojian as a suspect. This document, which we will refer to as a work order, had blood on it. It was torn, but it indicated the customer's name was Sherry Flanagan. The work order contained only a partial address because of the tear.

Herion obtained a statement from Morgan. Much of the statement was consistent with Morgan's trial testimony. Herion testified, however, that Morgan did not tell him the perpetrator had a goatee. Nor did Morgan describe the perpetrator's vehicle as a four-door pickup, but instead described it as a two-door pickup.

Deputy Sheriff Michael Clark went to the hospital in an attempt to interview Joyce. Medical personnel were working on her injuries when he arrived. Clark observed several abrasions on her face, a large amount of blood on the back of her head, and what appeared to be a gunshot wound to the chest. X-rays of the gunshot wound showed the wound was caused by snake shot.

Clark was able to obtain general information about the crime. Joyce described the perpetrator as a White adult male, five feet four inches tall with a heavy build, well groomed, thinning brown hair, and wearing a white T-shirt. She described the vehicle as a newer four-door pickup with tinted windows and large tires.

Detective Leo Lopez interviewed Joyce in the hospital recovery room shortly after her surgery. Joyce's description of the robbery was similar in all relevant respects to her trial testimony. She described the perpetrator as 35 to 40 years old, stocky, five feet four inches tall with short reddish hair, and wearing a white collarless, button-down shirt. The perpetrator smelled of alcohol and had hairy arms. On cross-examination, Lopez testified Joyce did not describe the perpetrator as having tight pants, a round belly, a sunburned face, or facial hair of any type.

Detective Patrick Oh, the lead investigator in the case, accompanied Lopez to the interview with Joyce. Oh showed Joyce the photo lineup that contained Soojian's picture. Before showing her the photo lineup, Oh advised Joyce he was going to show her a series of photographs, the perpetrator may or may not be included in the photo lineup, to look carefully to see if she recognized anyone, and the hair color, hair length and facial hair may be different now than in the photograph. He

suggested she focus on something like the eyes, nose or mouth, since those areas do not change. Joyce identified Soojian as the perpetrator.

Oh also interviewed Morgan at the scene of the crime. Morgan did not tell Oh a toolbox was in the bed of the pickup; nor did he state the perpetrator had a goatee. Morgan stated he did not get a good look at the suspect. Morgan was unable to identify anyone from the photo lineup that included Soojian.

On the day of the shooting, Oh called Flanagan because her name appeared on the work order found at the scene. Flanagan told Oh she obtained the document from Soojian. Oh then checked DMV records and found a 2004 pickup was registered in Soojian's name. Soojian's DMV photo was made part of the photo lineup discussed above. The other five photos in the lineup were generated by a computer program designed to find photos similar to the one of the suspect.

After Joyce identified Soojian as her attacker, Oh decided to interview Soojian at the address listed with the DMV. Oh was accompanied by his partner, Lopez, his lieutenant, Robert Kandarian, and two patrol officers. As they approached Soojian's residence, Oh saw the 2004 pickup in front of Soojian's mobilehome. Oh walked by the pickup on the way to the front door of the mobilehome. Oh confirmed the license plate number matched the information he had obtained from the DMV and noted several items in the bed of the pickup, including a rope, a horse bridle, and a nylon cord with metal attached to it.

When Oh approached the front door of the mobilehome, he could see a figure in the home through the screen door. He called out asking Soojian to come outside. When Soojian turned toward the front door, Oh noticed Soojian was on the phone making arrangements for someone to pick up his son. Soojian exited the mobilehome and made a phone call to his father. Oh began questioning Soojian after Soojian left a message for his father.

Oh first asked if Soojian if he was surprised to see him, to which Soojian replied he was not. Oh next asked Soojian if he would talk with him, to which Soojian responded, "No." When asked where he was the previous night, Soojian replied that he would rather not answer the question. Soojian gave the same response when asked if he had lent his pickup to anyone the previous night. Soojian refused to consent to a search of his pickup. Oh then arrested Soojian.

Defense counsel pointed out on cross-examination there were numerous other items in the bed of Soojian's pickup that were not described by Morgan, including a box containing a toilet seat and a 50–pound bag of tile mortar. Defense counsel also elicited from Oh that when Oh arrived at the scene, the key to Soojian's pickup was in the ignition. The only item on the key ring in addition to the ignition key was a car alarm fob, which was inconsistent with Joyce's description of numerous keys on the keyring.

Other detectives that responded to Soojian's residence testified about the condition of Soojian's pickup. It was noticed that an area in the rear passenger side of the pickup appeared to have been recently wiped when compared to the surrounding area. This area was tested and came back positive for possibly containing blood, although a number of common substances also could have caused a positive test result. An area of horizontal lines was located above the rear passenger tire that appeared to be a transfer of some type, possibly from a piece of fabric. A small spot of possible blood was found near the rear wheel well on the passenger side and near the top of the bed on the passenger side.

Small pieces of vegetation were observed in the bed of the pickup and collected. This vegetation was compared to a piece of vegetation Morgan found in his hair shortly after the incident. Nothing taken from the bed of Soojian's pickup matched the piece of vegetation Morgan found in his hair.

Also located in the bed of the pickup were a yellow tow strap, a white rope, two green horse bridles, a D-cell battery, a 50–pound bag of tile mortar, two 5–gallon plastic plant containers, and a toilet seat in a box. There was not a small metal toolbox in the bed of the pickup. No fingerprints were recovered from the right side of the exterior of the pickup.

The interior of the pickup was fairly clean. A coffee cup and a box of blank checks were on the floor of the passenger side of the truck. The box of checks did not appear to be crushed or stepped on. A tape measure was on the front seat between the passenger and driver's seats. The dashboard lights gave off an orange glow. Three areas of what could have been blood were located inside the pickup—one on the dashboard above the radio, another on the interior surface of the passenger door, and a third on the steering wheel. A torn piece of paper was located in the pocket of the driver's side door. None of the reports stated the interior appeared to have been cleaned recently. No papers were found on the floor of the pickup. No blood stains were observed on the floor of the pickup or on the cloth seats.

A fingerprint was found on the passenger door. No other usable fingerprints were found in the interior of the pickup. There was no evidence a firearm had been discharged inside the cab of the pickup. Nor was there any evidence the interior of the pickup had been recently cleaned.

The search of Soojian's residence resulted in the discovery of .22–caliber ammunition that was similar (snake shot) to the type of ammunition with which Joyce had been shot. Expert testimony established a few handguns would fire this ammunition. A pale green T-shirt was recovered from the bedroom. A keyring with 11 keys was found in the living room. Underneath the mobilehome detectives discovered a pair of black jeans in which a pair of sandals was rolled up. No handguns were found at the residence. Nor was any other firearm found that would have been capable of utilizing the .22–caliber ammunition that was found. The detectives did not locate Joyce's wallet or credit cards. Nor was a metal toolbox located.

The jeans found under the mobilehome had a size 38–inch waist and the sandals were a size 10. Presumptive testing indicated the presence of blood on the jeans. Samples were taken and sent for DNA testing. Stains were found on the inside of the pale green T-shirt, leaving the impression the stains occurred when the shirt was worn inside out. Two of these stains were sent to the lab that conducted the DNA testing in this case but were not initially tested.

In late 2010, six years after Joyce was assaulted, Soojian's wife, Jody, told law enforcement the mobilehome had a secret or hidden room. Jody also saw Soojian with cigarettes on the day prior to the assault on Joyce.

The mobilehome again was searched in 2011 for the purpose of inspecting the hidden room. Law enforcement discovered an ammunition box in the room. A plastic container labeled "Tannen's papers" also was located in the room. Inside the plastic container law enforcement found papers that appeared to belong to Soojian.

While the 2011 inspection was occurring, the power to the mobilehome failed. In 2004, the power to the mobilehome also failed during the service of the search warrant. It was determined the power to the mobilehome originated at the main house, where Soojian's parents resided, but it was unclear if the loss of power was intentional or the result of faulty workmanship in the installation of a power line to the mobilehome.

Shoe tracks found at the scene of the crime were compared to the tracks of the sandals found underneath Soojian's mobilehome. The lack of individual characteristics made a positive identification impossible. The two items, however, had similar class characteristics, including tread design, length, and width of the sole pattern.

Crime scene technicians compared the partially torn work order, which had blood on it, to the torn piece of paper found in the driver's door of Soojian's pickup. The crime scene technician testified the two pieces appeared to fit together to make a whole document, i.e., the piece of paper found in Soojian's pickup was torn from the work order found at the scene of the crime.

A small partial palm print was recovered and documented on the doorjamb/window area of Joyce's vehicle. The palm print did not match Soojian or Bolin, nor was it a match for any print found in the computerized database. In addition, a relatively fresh tire track was identified and documented. This tire track was on the shoulder approximately 20 to 40 feet from Joyce's pickup. It did not match the tires from Soojian's pickup.

No gunshot residue was found on Soojian's hands when they were tested approximately nine hours after the shooting. The interior of his truck was not tested for gunshot residue.

### Percipient Witness Testimony

Larry Crawford lived close by to the scene of the shooting. He testified that about 3:45 a.m. he heard a woman screaming and then at least one gunshot. He looked out his window and saw Joyce on the porch of his neighbor that lived across the street. He heard a vehicle drive quickly from the scene, although he never saw the vehicle. The vehicle sounded like a construction vehicle with a rack on it. Crawford worked in construction and was familiar with the sound such vehicles make. Crawford told law enforcement what he heard, although he did not know with whom he spoke.

Flanagan testified that in April 2004 she had obtained an estimate for some ceramic tile work at her house. Soojian was the individual who provided her the estimate. The work order recovered from the scene appeared to be the document she obtained from Soojian.

One of the physicians who treated Joyce in the hospital described Joyce's head injuries as a superficial laceration on the forehead, abrasions on the crown of the head, a superficial laceration on right rear area of the head, and a contusion on the forehead. X-rays of the gunshot wound suffered by Joyce showed numerous tiny pellets, smaller than seen in a typical shotgun wound.

### DNA Testing

DNA testing established:

(1) The blood on the work order[7] found at the scene came from Joyce;

(2) The only DNA obtained from the scrapings from underneath Soojian's fingernails belonged to Soojian;

(3) The blood found on the right side above the wheel well of Soojian's pickup came from Joyce;

(4) The blood stain from the steering wheel contained two DNA profiles, and those profiles were consistent with both Soojian and Joyce. The possibility that another individual also would fit within the obtained profile was one in 11 million;

(5) Two samples from the black jeans found under the mobilehome were tested in February 2005. One sample from the right thigh area did not provide any DNA results. The second sample from the right knee area contained blood, and the DNA from that blood came from Joyce;

(6) Additional DNA testing of the black jeans found under the mobilehome was conducted in June 2011 to determine who was wearing the pants. A sample from the zipper area located two contributors of DNA. Soojian likely was one donor, while Joyce could have been the other donor, as could one in approximately 450,000 other women. A sample from the inside of the left pocket identified Soojian as the donor. A sample taken from inside the crotch area identified two possible contributors, Joyce (one in 38 million) and Soojian (one in 450,000).

(7) Samples from the sandals recovered from under Soojian's mobilehome were tested in June 2011. One sample gave a strong indication Joyce was the contributor (one in 39 million), and a very weak indication that Soojian was a contributor (one in 250). A second sample gave a strong indication that Soojian was the major contributor (one in 96 trillion) and a very weak indication of a second contributor that was not Joyce.

(8) Bolin was excluded as a possible contributor to the DNA recovered from the black jeans. He was, however, a possible contributor (one in 11) on one sandal, but excluded as a possible contributor on the other sandal.

(9) Bolin was excluded as a possible contributor to the DNA sample obtained from the steering wheel.

(10) Two cuttings from the green T-shirt recovered from the bedroom of Soojian's mobilehome were taken in 2004 and tested in September 2011. The samples were properly preserved in the seven years between when they were taken and when they were tested. DNA recovered from the blood found on the green T-shirt came from Joyce.

(11) A second sample from the green T-shirt suggested the blood came from Joyce, while a minor contributor could be Soojian (one in 10,000) but could not be Bolin. The control sample submitted with this sample contained Soojian's DNA. Three other samples from the collar area of the green T-shirt were tested in September 2011. They contained Soojian's DNA, with Joyce and Bolin being excluded as possible contributors.

---

[7] The testing of the first four listed items occurred in approximately May 2004.

There also was testimony about possible contamination that may have occurred on the green T-shirt and black jeans. After the first trial, the jeans and sandals had been kept together in an evidence bag. Soojian's green T-shirt was kept in a sealed box that also contained Soojian's boots and socks. The socks were in a paper bindle, but the bindle had a slight tear in it. The boots were in a paper bindle, but the bindle was badly torn and had to be packaged in a new bindle. The green T-shirt was in a paper bindle, but the edge was ripped open. The original samples cut from the green T-shirt appeared to have been sealed properly to avoid contamination.

***Evidence Tampering Testimony***

Damaris Davidian worked for the software company that provided the accounting software used by Tri R. Ceramics, the company for which Soojian worked at the time of the assault and the company owned by Soojian's family. In November of 2011, Davidian received a phone call asking if she could locate a copy of the April 2004 bid for Flanagan. Locating the document was difficult because it was created as a DOS based file, and the company had since changed to a Window's-based operating system. Davidian located two quotes and saved one to a text file and then printed the text file. At Tanny Soojian's (Soojian's father) request, she sent a copy of the bid to Soojian's lawyers. There was a notation at the bottom of the bid that read: "Christina, finish quantities. We do plumbing. Have Aaron look at appliances. Possible problem." This notation apparently was added to the document on October 27, 2011. Davidian later learned the document had been altered on October 26, 2011. At the time the alteration was made, Deborah Soojian, Soojian's mother, was logged into the computer. However, employee passwords were common knowledge in the company, so anyone could have logged in using Deborah's name and password. Davidian was confident that Tanny did not have the computer expertise to locate the bid.

***Defense Evidence***

Bolin testified on behalf of Soojian. He explained he was Tanny's nephew, and began working for Tanny in the ceramic business beginning in late 2003. He identified the work order found at the scene as one that comes from a pad and is used to obtain original customer information. The representative would take the work order to the job site to make notes about the job so an estimate could be prepared. The work order would then be returned to the office and the bid entered into the computer. After the bid was completed and accepted by the customer, the work order might be used by different individuals working on the job for the address of the project.

Bolin lived in a mobilehome on the Soojian property beginning in late 2003. It was not unusual to find people wandering around the property because it was open with no gates. He also was familiar with Soojian's truck. He testified the diesel engine was very quiet, almost like a car. Soojian kept the truck neat and did not leave papers on the floor. Soojian did not have a shiny metal toolbox. Soojian did not smoke cigarettes and would not let anyone smoke in his truck.[8]

At the time of the attack, Bolin drove a 1989 Ford pickup. It had a construction rack and several tool boxes in the back of the truck. On the day before the assault, Bolin had parked his truck in front of his mobilehome. The following morning the truck was not where he had left it. He found it the day after the assault at his cousin Spencer's house, which was about 400 yards from his house.

---

[8] Peter Delgadillo and Garrett Sanchez, confirmed the testimony about the appearance of Soojian's truck.

On the day before the assault, which was a Saturday, Bolin had worked on a job and returned home about 6:00 p.m. A short while later Soojian asked Bolin to assist him in installing tile in Soojian's mobilehome. They finished the job about 10:30 p.m. Bolin and Soojian then went out to pick up dinner. While they were out they bought gas; the receipt established this occurred at 11:15 p.m. They returned to Bolin's mobilehome about midnight and ate the food they had picked up. Soojian left to feed the horses after eating. Soojian returned about 2:00 a.m. Around 3:30 a.m. Soojian left to return to his mobilehome.

The next day Bolin learned the police were at Soojian's mobilehome when Soojian called him and asked him to look after his (Soojian's) son. Soojian's son arrived shortly thereafter and told Bolin the police were at the mobilehome. Bolin learned from the sheriff's officers that Soojian had been arrested and that the officers were waiting for a search warrant. While they were waiting, Bolin saw one of the officers open the door to the truck and look inside.

Soojian also called numerous expert witnesses, as well as several witnesses who testified about how the exhibits were stored after the first trial. These witnesses established that the black jeans, green T-shirt, and sandals were not stored in a manner to preserve DNA evidence, which led to defense counsel arguing the results of the 2011 tests were not reliable because of potential contamination.

A private investigator hired by Soojian testified how in 2007, after the first trial, he located and purchased the truck owned by Bolin at the time of the attack. After the vehicle was purchased in the Fresno area, the private investigator had it towed to the Soojian farm, where it was stored for a few days before it was transported to the Los Angeles area for forensic examination.

Deborah explained the work order usually was generated in the company's showroom and was used to obtain customer information. Then, if the customer wanted an estimate, the estimator would take the work order, with directions, to the potential job. After the estimator visited the job, he returned the work order to the office where a proposal was prepared. Soojian was the head estimator in 2004.

Deborah confirmed that Soojian did not smoke cigarettes in 2004, and his pickup did not smell of cigarettes. She also confirmed he kept the pickup neat.

On the night of the assault, Deborah stopped by Soojian's mobilehome and visited for about 20 minutes while Soojian and Bolin were installing tile. The following morning she saw a truck near Soojian's mobilehome that normally was not there. Soojian and his son came to her home for breakfast around 7:30 a.m. Although she did not see Soojian drive to her home that morning, normally he drove when he came over.

Edward Hulsey, Soojian's uncle, lived on some property adjacent to the Soojian property. On the day Soojian was arrested, Hulsey went to Soojian's mobilehome after the police left. Hulsey and his son took all of the marijuana plants out of the hidden room. While in the room, Hulsey did not see any firearms, wallet, driver's license, or clothing.

A forensic expert suggested that certain aspects of the investigation were not done as well as they could have been. Nothing to which he testified, however, suggested the evidence was compromised.

Psychologist Mitchell Eisen, Ph.D., testified as an expert witness on memory and various factors that affect one's memory, including time, trauma, stress, distractions, suggestions, and focus. Eisen was careful to explain he was speaking about memory in general and not specifically about the reliability of anyone's testimony in this case. He also was careful to explain that even though a witness experienced one or more of the factors that could impact memory, his or her memory of the event may be accurate. Finally, Eisen discussed optimum procedures for presenting photographs to a witness when attempting to identify a suspect and factors that could affect a photographic identification.

Terri Haddix, M.D., testified she would not have expected a lot of blood inside the cab of the perpetrator's vehicle as a result of the gunshot wound because the clothes Joyce was wearing at the time she was shot would have absorbed a considerable amount of blood. The amount of blood found inside Soojian's vehicle, however, was inconsistent with the head wounds suffered by Joyce. Haddix also would have expected to see blood in the area where Joyce was located when she was struck, either on the seat or on the floor of the vehicle.

Marc Scott Taylor, the expert primarily retained to address DNA issues, testified, in essence, that he agreed with the DNA results and statistics that were presented by the prosecution. In addition, Taylor tested another sample from the black jeans found under Soojian's mobilehome and found a mixture of DNA, and neither Soojian nor Joyce could be excluded as the source of the deposits. There also possibly could have been DNA from a third person in that sample. Taylor also tested the green T-shirt found in Soojian's bedroom and reached the same conclusions as the prosecution's DNA witness.

The primary thrust of Taylor's testimony related to possible contamination. He pointed out that if the black jeans were not individually sealed after the first trial, then it was possible the jeans were contaminated. Similarly, handling the exhibits without proper precautions, as occurred in this case during and after the first trial, would cause concern of possible contamination. Specifically, the dry blood from the vest worn by Joyce when she was shot was a concern. Taylor testified that when blood dries on a fabric, and that fabric is handled, the dried blood comes off like dust. That dust could contaminate any other object with which it came in contact. Because of the possible contamination, Taylor testified it would be difficult to draw valid conclusions from the test results. Similarly, because the green T-shirt was in a package that was open, and it was stored in a box with Soojian's shoes and socks, it was possible that contamination occurred.

Taylor also testified about the examination of the truck Bolin owned at the time of the assault. They were not able to extract any DNA from the areas tested from the interior of the truck. They did locate some small lead pellets in the interior of the truck. In addition, when they removed the seats and the seatbelts for testing, he saw a driver's license in the sleeve through which the webbing of the seatbelt went before it attached to the frame of the vehicle. The driver's license was not visible until the plastic sleeve was rolled down from the webbing. The driver's license had been issued to Joyce.

### Closing Arguments
The prosecutor focused on the overwhelming evidence of Soojian's guilt, emphasizing the DNA evidence established that Joyce's blood was found both inside and outside Soojian's vehicle and also on the pants and T-shirt he had worn.

Defense counsel asserted (1) the DNA testing could not be relied upon because of possible contamination both before the truck was recovered and as a result of the improper storage of the exhibits after the first trial; (2) Joyce's identification of Soojian was tainted and thus not reliable; and (3) discovery of Joyce's driver's license in Bolin's vehicle created reasonable doubt about whether Soojian's pickup was the vehicle used in the assault.

Soojian, 2014 WL 7340275, at *1–11 (footnotes in original).

## III.

## STANDARD OF REVIEW

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution. The challenged convictions arise out of Fresno County Superior Court, which is located within the Eastern District of California. 28 U.S.C. § 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997) (en banc). The instant petition was filed after the enactment of AEDPA and is therefore governed by its provisions.

Under AEDPA, relitigation of any claim adjudicated on the merits in state court is barred unless a petitioner can show that the state court's adjudication of his claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); Harrington v. Richter, 562 U.S. 86, 97–98 (2011); Lockyer v. Andrade, 538 U.S. 63, 70–71 (2003); Williams, 529 U.S. at 413.

As a threshold matter, this Court must "first decide what constitutes 'clearly established Federal law, as determined by the Supreme Court of the United States.'" Lockyer, 538 U.S. at 71

14

(quoting 28 U.S.C. § 2254(d)(1)). In ascertaining what is "clearly established Federal law," this Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." Williams, 529 U.S. at 412. "In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." Id. In addition, the Supreme Court decision must "'squarely address [] the issue in th[e] case' or establish a legal principle that 'clearly extend[s]' to a new context to the extent required by the Supreme Court in . . . recent decisions"; otherwise, there is no clearly established Federal law for purposes of review under AEDPA. Moses v. Payne, 555 F.3d 742, 754 (9th Cir. 2009) (quoting Wright v. Van Patten, 552 U.S. 120, 125 (2008)); Panetti v. Quarterman, 551 U.S. 930 (2007); Carey v. Musladin, 549 U.S. 70 (2006). If no clearly established Federal law exists, the inquiry is at an end and the Court must defer to the state court's decision. Musladin, 549 U.S. 70; Wright, 552 U.S. at 126; Moses, 555 F.3d at 760.

If the Court determines there is governing clearly established Federal law, the Court must then consider whether the state court's decision was "contrary to, or involved an unreasonable application of, [the] clearly established Federal law." Lockyer, 538 U.S. at 72 (quoting 28 U.S.C. § 2254(d)(1)). "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams, 529 U.S. at 412–13; see also Lockyer, 538 U.S. at 72. "The word 'contrary' is commonly understood to mean 'diametrically different,' 'opposite in character or nature,' or 'mutually opposed.'" Williams, 529 U.S. at 405 (quoting Webster's Third New International Dictionary 495 (1976)). "A state-court decision will certainly be contrary to [Supreme Court] clearly established precedent if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases." Id. If the state court decision is "contrary to" clearly established Supreme Court precedent, the state decision is reviewed under the pre-AEDPA de novo standard. Frantz v. Hazey, 533 F.3d 724, 735 (9th Cir. 2008) (en banc).

///

"Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413. "[A] federal court may not issue the writ simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411; see also Lockyer, 538 U.S. at 75–76. The writ may issue only "where there is no possibility fair minded jurists could disagree that the state court's decision conflicts with [the Supreme Court's] precedents." Richter, 562 U.S. at 102. In other words, so long as fair minded jurists could disagree on the correctness of the state court's decision, the decision cannot be considered unreasonable. Id. If the Court determines that the state court decision is objectively unreasonable, and the error is not structural, habeas relief is nonetheless unavailable unless the error had a substantial and injurious effect on the verdict. Brecht v. Abrahamson, 507 U.S. 619, 637 (1993).

The court looks to the last reasoned state court decision as the basis for the state court judgment. Stanley v. Cullen, 633 F.3d 852, 859 (9th Cir. 2011); Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004). If the last reasoned state court decision adopts or substantially incorporates the reasoning from a previous state court decision, this court may consider both decisions to ascertain the reasoning of the last decision. Edwards v. Lamarque, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc). "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." Richter, 562 U.S. at 99. This presumption may be overcome by a showing "there is reason to think some other explanation for the state court's decision is more likely." Id. at 99–100 (citing Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991)).

Where the state court reaches a decision on the merits but provides no reasoning to support its conclusion, a federal habeas court independently reviews the record to determine whether habeas corpus relief is available under § 2254(d). Stanley, 633 F.3d at 860; Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003). "Independent review of the record is not de novo

review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable." Himes, 336 F.3d at 853. While the federal court cannot analyze just what the state court did when it issued a summary denial, the federal court must review the state court record to determine whether there was any "reasonable basis for the state court to deny relief." Richter, 562 U.S. at 98. This court "must determine what arguments or theories ... could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." Id. at 102.

## IV.

## DISCUSSION

### A. Juror Misconduct and Bias

In his first, second, and third claims for relief, Petitioner asserts that the jury engaged in misconduct, resulting in the denial of his right to trial by an impartial jury. (ECF No. 1 at 3; ECF No. 1-1 at 12–38).[9]

#### 1. No-Impeachment Rule

"A general rule has evolved to give substantial protection to verdict finality and to assure jurors that, once their verdict has been entered, it will not later be called into question based on the comments or conclusions they expressed during deliberations. This principle, itself centuries old, is often referred to as the no-impeachment rule." Pena-Rodriguez v. Colorado, 137 S. Ct. 855, 861 (2017). The no-impeachment rule is embodied in Federal Rule of Evidence 606(b), which provides:

> (1) Prohibited Testimony or Other Evidence. During an inquiry into the validity of a verdict or indictment, a juror may not testify about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment. The court may not receive a juror's affidavit or evidence of a juror's statement on these matters.
>
> (2) Exceptions. A juror may testify about whether:
>
> > (A) extraneous prejudicial information was improperly brought to the jury's attention;

---

[9] Page numbers refer to ECF page numbers stamped at the top of the page.

(B) an outside influence was improperly brought to bear on any juror; or

(C) a mistake was made in entering the verdict on the verdict form.

Fed. R. Evid. 606(b). "A long line of precedent distinguishes juror testimony about the consideration of extrinsic evidence, which we may consider, from juror testimony about the subjective effect of evidence on any of the particular jurors here, which we may not consider." Estrada v. Scribner, 512 F.3d 1227, 1237 (9th Cir. 2008). Rule 606 applies in federal habeas cases. See Estrada, 512 F.3d 1227 (applying Rule 606 in federal habeas case governed by AEDPA).

2. Conviction After First Trial

In his first claim for relief, Petitioner asserts that the jury improperly discussed and considered Petitioner's conviction after his first trial. (ECF No. 1 at 3; ECF No. 1-1 at 12). Respondent argues that the state court's denial of Petitioner's juror misconduct claim was reasonable. (ECF No. 20 at 23).

Petitioner raised this juror misconduct claim on direct appeal to the California Court of Appeal, Fifth Appellate District, which denied the claim in a reasoned decision. The California Supreme Court summarily denied Petitioner's petition for review. As federal courts review the last reasoned state court opinion, the Court will "look through" the California Supreme Court's summary denial and examine the decision of the California Court of Appeal. See Brumfield v. Cain, 135 S. Ct. 2269, 2276 (2015); Johnson v. Williams, 568 U.S. 289, 297 n.1 (2013); Ylst, 501 U.S. at 806.

In denying the juror misconduct claim regarding Petitioner's conviction after the first trial, the California Court of Appeal stated:

> ***Applicable Law***
> "A defendant accused of a crime has a constitutional right to a trial by unbiased, impartial jurors. [Citation.] A defendant is 'entitled to be tried by 12, not 11, impartial and unprejudiced jurors. "Because a defendant charged with a crime has a right to the unanimous verdict of 12 impartial jurors [citation], it is settled that a conviction cannot stand if even a single juror has been improperly influenced." [Citations.]' [Citations.]" (*People v. Nesler* (1997) 16 Cal.4th 561, 578 (*Nesler* ).) Because there are no perfect trials, however, a defendant is entitled to a fair trial, not a perfect trial. (*McDonough Power Equipment, Inc. v. Greenwood* (1984) 464 U.S. 548, 553.) "Trials are costly, not only for the parties, but also for the jurors performing their civic duty and for society which pays the judges and support

personnel who manage the trials. It seems doubtful that our judicial system would have the resources to provide litigants with perfect trials, were they possible, and still keep abreast of its constantly increasing caseload." (*Ibid.*)

Moreover, because jurors are human, it is doubtful that even unlimited funding would result in a perfect trial. " 'The jury system is an institution that is legally fundamental but also fundamentally human. Jurors bring to their deliberations knowledge and beliefs about general matters of law and fact that find their source in everyday life and experience. That they do so is one of the strengths of the jury system. It is also one of its weaknesses: it has the potential to undermine determinations that should be made exclusively on the evidence introduced by the parties and the instructions given by the court. Such a weakness, however, must be tolerated. "[I]t is an impossible standard to require ... [the jury] to be a laboratory, completely sterilized and freed from any external factors." [Citation.] Moreover, under that "standard" few verdicts would be proof against challenge.' [Citation.]" (*In re Carpenter* (1995) 9 Cal.4th 634, 650.)

What jurors must do, however, is render a verdict based on the evidence presented at trial. " 'The requirement that a jury's verdict "must be based upon the evidence developed at the trial" goes to the fundamental integrity of all that is embraced in the constitutional concept of trial by jury.... [¶] In the constitutional sense, trial by jury in a criminal case necessarily implies at the very least that the "evidence developed" against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel.' [Citation.] As the United States Supreme Court has explained: 'Due process means a jury *capable and willing to decide the case solely on the evidence before it* ....' [Citations.]" (*Nesler, supra,* 16 Cal.4th at p. 578.) This requirement does not mean a juror must be totally ignorant of the case on which he or she is sitting. " ' "The theory of the law is that a juror who has formed an opinion cannot be impartial." [Citation.] [¶] It is not required, however, that the jurors be totally ignorant of the facts and issues involved.... It is sufficient if the juror can lay aside his impression or opinion *and render a verdict based on the evidence presented in court.'* [Citations.]" (*Id.* at pp. 580–581.)

The issue in this case, juror misconduct, refers to the situation where a juror's ability to render a verdict based on the evidence presented in court is potentially compromised. Juror misconduct may take many forms, including refusal to deliberate (*People v. Leonard* (2007) 40 Cal.4th 1370, 1410–1411 (*Leonard* )), speaking with someone involved in the case outside the courtroom (*People v. Loker* (2008) 44 Cal.4th 691, 754 (*Loker* )), receipt of information about the case, either intentionally or inadvertently, that was not presented in court (*People v. Danks* (2004) 32 Cal.4th 269, 307 (*Danks* ); *Nesler, supra,* 16 Cal.4th at p. 578), bringing passages from the Bible into deliberations (*Danks,* at p. 308), discussing the case with a nonjuror (*id.* at p. 304), or concealment of material information during voir dire (*In re Hitchings* (1993) 6 Cal.4th 97, 119). This list is merely representative of possible types of juror misconduct, and not an exhaustive list. Moreover, juror misconduct does not necessarily mean the conduct of the juror was blameworthy. (*Nesler,* at p. 579.)

When a defendant claims there was jury misconduct, he or she generally supports the claim with declarations executed by a member or members of the jury. We begin our review by determining what portions of the declarations are admissible, a determination framed by Evidence Code section 1150. (*Danks, supra,* 32 Cal.4th at p. 301.)

"Evidence Code section 1150, subdivision (a), provides: 'Upon an inquiry as to the validity of a verdict, any otherwise admissible evidence may be received as to statements made, or conduct, conditions, or events occurring, either within or without the jury room, of such a character as is likely to have influenced the verdict improperly. No evidence is admissible to show the effect of such statement, conduct, condition, or event upon a juror either in influencing him to assent to or dissent from the verdict or concerning the mental processes by which it was determined.'

" 'This statute distinguishes "between proof of overt acts, objectively ascertainable, and proof of the subjective reasoning processes of the individual juror, which can be neither corroborated nor disproved...." ' [Citation.] ' "This limitation prevents one juror from upsetting a verdict of the whole jury by impugning his own or his fellow jurors' mental processes or reasons for assent or dissent. The only improper influences that may be proved under [Evidence Code] section 1150 to impeach a verdict, therefore, are those open to sight, hearing, and the other senses and thus subject to corroboration." ' [Citation.]" (*Danks, supra,* 32 Cal.4th at pp. 301–302.)[10]

If admissible evidence establishes juror misconduct, we then proceed to the issue of whether the misconduct requires reversal of the judgment. This portion of the analysis begins with a presumption of prejudice that may be rebutted by proof that no prejudice actually resulted. (*People v. Holloway* (1990) 50 Cal.3d 1098, 1108 (*Holloway* ), disapproved on other grounds in *People v. Stansbury* (1995) 9 Cal.4th 824, 830, fn. 1.)

"We have long recognized the reason for this rule: 'A juror is not allowed to say: "I acknowledge to grave misconduct. I received evidence without the presence of the court, but those matters had no influence upon my mind when casting my vote in the juryroom." The law, in its wisdom, does not allow a juror to purge himself in that way. It was said in Woodward v. Leavitt [ (1871) ] 107 Mass. 466: "But, where evidence has been introduced tending to show that without authority of law, but without any fault of either party or his agent, a paper was communicated to the jury which might have influenced their minds, the testimony of the jurors is admissible to disprove that the paper was communicated to them, though not to show whether it did or did not influence their deliberations and decision. A juryman may testify to any facts bearing upon the question of the existence of the disturbing influence, but he cannot be permitted to testify how far that influence operated upon his mind." ' [Citation.] That principle is now embodied in Evidence Code section 1150.

" 'The presumption of prejudice is an evidentiary aid to those parties who are able to establish serious misconduct of a type likely to have had an effect on the verdict or which deprived the complaining party of thorough consideration of his case, yet who are unable to establish by a preponderance of the evidence that actual prejudice occurred. The law thus recognizes the substantial barrier to proof of prejudice which Evidence Code section 1150 erects, and it seeks to lower that barrier somewhat.' [Citation.]" (*Holloway, supra,* 50 Cal.3d at p. 1109.)

The standard for determining whether a juror was biased, in other words whether

---

[10] Evidence Code section 1150 remains unchanged.

the defendant suffered any prejudice, is a well-established two-part analysis.

> " '[W]hen misconduct involves the receipt of information from extraneous sources, the effect of such receipt is judged by a review of the entire record, and may be found to be nonprejudicial. The verdict will be set aside only if there appears a substantial likelihood of juror bias. Such bias can appear in two different ways.' [Citation.]

> " 'First, we will find bias if the extraneous material, judged objectively, is inherently and substantially likely to have influenced the juror.' [Citation.] 'Under this standard, a finding of "inherently" likely bias is required when, but only when, the extraneous information was so prejudicial in context that its erroneous introduction in the trial itself would have warranted reversal of the judgment. Application of this "inherent prejudice" test obviously depends upon a review of the trial record to determine the prejudicial effect of the extraneous information.' [Citation.]

> "Second, 'even if the extraneous information was not so prejudicial, in and of itself, as to cause "inherent" bias under the first test,' the nature of the misconduct and the 'totality of the circumstances surrounding the misconduct must still be examined to determine objectively whether a substantial likelihood of actual bias nonetheless arose.' [Citation.] 'Under this second, or "circumstantial," test, the trial record is not a dispositive consideration, but neither is it irrelevant. All pertinent portions of the entire record, including the trial record, must be considered. "The presumption of prejudice may be rebutted, inter alia, by a reviewing court's determination, *upon examining the entire record,* that there is no substantial likelihood that the complaining party suffered actual" ' bias. [Citation.]" (*Danks, supra,* 32 Cal.4th at p. 303.)

While the above quote from *Danks* refers to improper receipt of information outside of the courtroom, the same analysis applies to all types of juror misconduct. It also is important to recognize that what constitutes bias of a juror will vary depending on the circumstances of the case. (*Nesler, supra,* 16 Cal.4th at p. 580.)

When conducting our review, we "accept the trial court's determinations and findings on questions of historical fact if they are supported by substantial evidence." (*People v. Ramos* (2004) 34 Cal.4th 494, 520 (*Ramos* ).) "The question whether the misconduct was prejudicial is a mixed one of law and fact, and is subject to an appellate court's independent determination. [Citation.]" (*Ibid.*)

### Soojian's Motion for a New Trial
Soojian presented his claims for juror misconduct in a motion for new trial. He supported his motion with declarations from two of the jurors.

The first declaration submitted by Soojian was executed by Juror No. 3. We will briefly summarize the portions of the declaration that are relevant to the assertions of misconduct. Our summary will exclude all statements that violated the dictates of Evidence Code section 1150, subdivision (a). There were numerous statements made that violated this code section, but it does not appear to be a dispute over which portions of the declaration were admissible and which portions were inadmissible.

Juror No. 3 stated that during deliberations the jury "discussed the fact that Mr.

Soojian had not testified. I recall a juror stating words to the effect of 'you don't want to testify if you're guilty,' although I do not recall which juror made that statement." Juror No. 3 also recalled that at "some point during the deliberations, one juror was holding out for a not guilty verdict. I recall another juror stating words to the effect of 'twelve other people found him guilty and now eleven people here think he is guilty, and only one person does not agree.' "

The second declaration presented by Soojian was executed by Juror No. 11. This juror too recalled that during deliberations the jury "discussed the fact that Mr. Soojian had not testified. The jury discussed that we would have liked to hear from Mr. Soojian. I recall a juror stating words to the effect of 'you don't want to testify if you're guilty,' although I do not recall which juror made that statement."

The People submitted declarations from 11 of the jurors in opposition to those submitted by Soojian, including new declarations from Jurors Nos. 3 and 11.[11] In Juror No. 3's second declaration she stated she was contacted in mid-August to discuss the trial and then was asked to sign a declaration in mid-September. After a brief review, she signed a declaration prepared by Soojian's attorneys. She was not provided a copy of the declaration after it was signed. Juror No. 3 found some errors when the prosecution provided her with a copy of the declaration she signed for Soojian's attorneys. In her second declaration, she stated she "did not make the statement or use the language ... 'you don't want to testify if you're guilty.' " She "did not recall any juror making a statement in those exact words or similar to those words during deliberations." Juror No. 3 denied any discussion during deliberations "on the topic of [Soojian] not testifying as relevant to his guilt or innocence." She also asserted the statement in her first declaration referring to wanting to hear Soojian speak during trial was taken out of context. Juror No. 3 asserted the jurors did not discuss Soojian's failure to testify, but instead discussed wanting to hear the sound of his voice because Morgan testified the perpetrator had a deep voice.

Juror No. 11 stated he met with Soojian's representatives and sometime later was asked to sign a declaration. Juror No. 11 did not receive a copy of the declaration. In Juror No. 11's second declaration he stated, "There was no discussion during deliberations equating [Soojian's] failure to testify as evidence of his guilt. That never happened." He also responded to the statement in his first declaration that an unknown juror said something similar to "you don't want to testify if you're guilty." In his second declaration Juror No. 11 stated, "Those are not my words, nor do I recall or believe that statement was articulated like that by any other juror." Juror No. 11 also confirmed the jury discussed wanting to hear Soojian testify, "but only because we wanted to hear the sound of his voice. Either [Joyce] or her son testified that the attacker's voice was deep. However, we never heard Mr. Soojian speak, not even once." Finally, Juror No. 11 confirmed that "[t]here was no discussion by any other juror that I am aware of that said or implied that Mr. Soojian was guilty because he did not testify."

Juror No. 1 was elected the foreperson of the jury. This juror did not recall anyone "making a statement such as 'you don't want to testify if you're guilty.' " Nor did this juror recall "any juror discussing whether defendant did or did not testify as a basis for guilt." Finally, Juror No. 1 explained, "[W]henever a topic came up that was off target, I redirected the conversation to focus on what we had to do. Any discussion of whether Defendant testified would have been off topic (if it even occurred)."

---

[11] Juror No. 12 refused to provide a declaration for either party.

Juror No. 2 did not recall "anyone during deliberations making a statement to the effect of 'you do not want to testify if you are guilty.' " This juror did recall "some discussion about Mr. Soojian not testifying, but I do not recall anything or any comment related to him being guilty because he did not testify."

Juror No. 4 did not hear during deliberations "any juror talk about [Soojian] testifying." Nor did this juror "recall anyone during deliberations ever saying words to the effect of: you don't want to testify if you're guilty." Similarly, Jurors Nos. 5, 6, 7, and 8 did not recall anyone suggesting that a defendant did not want to testify if he was guilty. Nor did these jurors recall Soojian's failure to testify coming up during deliberations.

Juror No. 9 did not recall anyone stating words to the effect that a defendant would not testify if he was guilty. Nor did this juror hear any discussion suggesting that Soojian's failure to testify was relevant to his guilt or innocence. Juror No. 9 stated during deliberations that he wanted to hear the sound of Soojian's voice because Morgan told the 911 operator the perpetrator had a deep voice.

Juror No. 10 stated that whenever an improper topic was brought up, another juror or jurors would make clear that the topic was not to be discussed. This juror recalled a discussion regarding the desire to hear Soojian speak to see if he had a deep voice.

After hearing argument, the trial court ruled on the motion:

> "As I glean from the defense motion for new trial and the points and authorities that have been submitted, the defense seeks a new trial pursuant to Penal Code Section 1181 subsections (2) and (3), namely, juror misconduct and legal error.

> "In ruling on a request for a new trial based on jury misconduct, the trial court must undertake a three-step inquiry. First, it must determine whether affidavits or declarations supporting the motion for new trial are admissible. Second, if the evidence is admissible, the trial court must determine whether the facts established misconduct. And, third, assuming misconduct, the trial court must determine whether the misconduct was prejudicial. [¶] ... [¶]

> "... Applying these principles to this case, the issue of whether the jury considered that the defendant did not testify is not supported by the declarations submitted. Therefore, the claim of misconduct concerning that aspect raised by the defense has not been supported by admissible evidence.

> "The next alleged misconduct that's attributed to the jurors is a comment in reference to presumably the verdict of the prior trial.... The Court agrees with the prosecution that there was no secret that there was a prior trial and, most likely, a verdict that ended up before the appellate court. Indeed, in addition to what [the prosecutor] has argued concerning issues and evidence that came up that was in reference to the prior litigation and trial, indeed in this case trial counsel for the defense cross-examined [Joyce] extensively about whether she was present during the argument in the prior trial. Presumably in an attempt to discredit [Joyce's] credibility.

"In any event, all those circumstances, seems to the Court, that—most people familiar with our legal system could deduce that there was a prior verdict. Even so, this does not show bias, given the extensive voir dire by the Court and by counsel, the answers given by each juror that he or she would decide this case solely on the evidence presented and the law given by the Court; the questions asked by the jurors during the deliberations; their requests for readback of certain testimony; the instructions given to the jury prior to deliberations; and, of course, the final arguments made by counsel; and, finally, the jury's verdict itself.

"As [defense counsel] has stated, the jury came back not guilty on one count, hung on the other—on one other, and guilty on the remaining. This Court finds that it is highly unlikely that any juror might have attached any importance to this claim—to the statement made by the juror in her declaration. In other words, it does not follow that the jurors failed to base their verdict solely on the evidence in this case and the law provided by the Court.

"Indeed, the Court finds that the record in this case does not support the defense motion for new trial based on juror misconduct. In addition, assuming that there was misconduct, the misconduct was not prejudicial. The Court concludes as the Court in the case of *People v. Hord* [ (1993) 15 Cal.App.4th 711], that transitory comments, though technically misconduct, are normally innocuous, particularly when a comment stands alone without any further discussion. This Court finds that that is true in this case as well. [¶] ... [¶]

"This was not a close case. Indeed, the verdict by the jury was very discerning. There was significant and in some—as to some issues, overwhelming amount of evidence pointing and supporting the jury's verdict of guilt of the defendant. Accordingly, the Court denies the motion for new trial on juror misconduct and errors of law."

### *Mistrial—Prior Trial*

As stated earlier, Soojian was first found guilty of various crimes related to these events in 2007. After two appeals, we ordered the trial court to grant Soojian's motion for a new trial based on newly discovered evidence.

As the trial court acknowledged, the issue of the prior trial was not kept from the jury. The parties entered into the following stipulation regarding the prior proceedings: "There was a previous trial in this matter which took place in 2007. We are here for a second trial because the Court of Appeal found there was additional information the jury should evaluate in reaching its decision, including new evidence as well as evidence that could have been presented but was not." This stipulation apparently was deemed necessary by the parties because of numerous references to the first trial, including testimony, exhibit storage, and the fact Joyce was present for the closing arguments in that case.

In addition to the stipulation, the trial court instructed the jury, "You have heard there was a prior trial in this matter. The outcome of the first trial and the reason there is a second trial are not evidence in this case. Your decision should be based only on the evidence presented in this case."

In his motion for a new trial, Soojian relied on the first declarations executed by Jurors Nos. 3 and 11. The declaration of Juror No. 11 is not relevant to this issue.

Only a single paragraph from the declaration of Juror No. 3 is relevant to this issue. In this paragraph Juror No. 3 stated that when one juror was holding out, another juror made the statement that 12 people had found Soojian guilty, apparently referring to the prior trial, and that now 11 people thought he was guilty and one person thought he was not guilty.

The first question we must answer is whether this statement constitutes misconduct. Taken at face value, the statement merely reflects the deliberations as they stood at that time and a reflection of what occurred in the past. Since the jury had been told about the prior trial via the stipulation, *to which Soojian agreed,* it is too late to complain the jury knew about the prior trial and inferred the prior trial had resulted in a conviction. Nor does misconduct occur simply because there is a reference to a historical fact.

Soojian apparently would like us to conclude the statement was an attempt to coerce the lone juror to find Soojian guilty. In an attempt to do so, Soojian makes broad assertions that are unsupported by the record.

First, Soojian asserts that making the statement violated the trial court's instruction "not to consider or discuss the prior conviction during deliberations." The trial court, however, did not instruct the jury not to discuss or mention the prior trial, or by inference the prior conviction. Instead, the trial court instructed the jury that the prior trial was not evidence, and the jury must base its verdict on the evidence presented in court. The statement did not violate this instruction. Nor did the statement suggest the prior conviction was evidence of Soojian's guilt.

Second, Soojian asserts the statement proves there was a discussion of "a matter beyond the scope of trial evidence as a basis for decision." We disagree. A single statement is neither a discussion nor a basis for a verdict. Indeed, the context suggests the statement was made after a discussion of the evidence had occurred and 11 jurors voted to find Soojian guilty. Moreover, while the trial court instructed the jury that the prior trial was not evidence, the stipulation informed the jury a prior trial occurred. This was *not* a case where information obtained from outside the courtroom was utilized in reaching a verdict.

Finally, Soojian argues this single statement "violated the requirements that the verdict be the product of the independent judgment of each juror and unanimous agreement." He goes on to assert that "[t]he majority jurors improperly told the holdout juror to acquiesce in the majority view based on the prior conviction." The majority of the jurors did no such thing. A single juror made a statement that may or may not have been heard by the holdout juror. There is no evidence any juror attempted to persuade the holdout juror to change his or her vote because of the prior trial.

Soojian's arguments do not convince us misconduct occurred. Nor does any case support Soojian's argument. We have reviewed the cases cited by Soojian, as well as numerous cases we located while conducting our own research. In no case that we reviewed did a trial or appellate court find juror misconduct as a result of such an innocuous statement like the one to which Soojian points. This is not a case in which information not presented to the jury was discussed during deliberations in an attempt to sway the vote. It was merely a statement made during deliberations evidencing frustration with a holdout juror, a statement reflecting human nature, the foundation of the jury system.

Soojian, 2014 WL 7340275, at *11–17 (footnotes in original).

Here, the allegedly prejudicial information at issue was Petitioner's conviction after his first trial. However, the fact of Petitioner's prior trial was not extraneous or extrinsic information because the parties stipulated to the following at Petitioner's second trial:

> There was a previous trial in this matter, which took place in 2007. We are here for a second trial because the Court of Appeal found there was additional information the jury should evaluate in reaching its decision, including new evidence as well as evidence that could have been presented but was not.

(2 CT 422; 3 RT[12] 684–85). The fact of Petitioner's prior trial was not introduced by any outside source or through improper channels. Thus, this information was not extrinsic and does not fall within the exception to the no-impeachment rule. See United States v. Rutherford, 371 F.3d 634, 640 (9th Cir. 2004) (holding Rule 606(b) bars consideration of jurors' statements that they ignored court instructions and discussed information they learned "through their personal observations during trial, not through a prohibited route or improper *ex parte* contact"). Accordingly, this Court cannot consider the portions of the jurors' affidavits regarding any statement or discussion of Petitioner's first trial that occurred during the jury's deliberations.

Even if this Court could consider those portions of the jurors' affidavits, the California Court of Appeal's denial of Petitioner's juror misconduct claim was not contrary to, or an unreasonable application of, clearly established federal law, nor was it based on an unreasonable determination of fact. The state court reasonably rejected Petitioner's argument that the statement violated the trial court's instruction not to discuss the prior conviction during deliberations, given that the jury was only instructed: "You have heard there was a prior trial in this matter. The outcome of the first trial and the reason there is a second trial are not evidence in this case. Your decision should be based only on the evidence presented in this case." (3 CT 723; 25 RT 6017). The state court also reasonably rejected Petitioner's argument that "the jurors committed misconduct by discussing a matter beyond the scope of trial evidence *as a basis for decision*." (ECF No. 1-1 at 17) (emphasis added). As noted by the court of appeal, "the context suggests the statement was made after a discussion of the evidence had occurred and 11 jurors

---

[12] "RT" refers to the Reporter's Transcript on Appeal lodged by Respondent on May 20, 2016. (ECF No. 21).

voted to find Soojian guilty," Soojian, 2014 WL 7340275, at *17, which militates against finding the statement impacted those jurors' decision.

Finally, the state court reasonably rejected Petitioner's argument that "[t]he majority jurors improperly told the holdout juror to acquiesce in the majority view based on the prior conviction, as well as the majority view in this case." (ECF No. 1-1 at 17). The record does not establish whether the holdout juror even heard the statement at issue, and there is nothing in the record demonstrating that any attempt was made to coerce the holdout juror to change his or her vote because of Petitioner's first trial. See Panella v. Marshall, 434 F. App'x 603, 605 (9th Cir. 2011) ("Panella has not pointed to any clearly established Supreme Court law holding that a jury verdict influenced by harassment but not [physical] coercion violates due process[.] We therefore agree with the district court that Panella's claim for habeas relief must be denied.").

Based on the foregoing, the California Court of Appeal's denial of Petitioner's juror misconduct claim based on the statement regarding his first trial was not contrary to, or an unreasonable application of, clearly established federal law,[13] nor was it based on an unreasonable determination of fact. The state court's decision was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter, 562 U.S. at 103. Accordingly, Petitioner is not entitled to habeas relief on his first claim, and it should be denied.

3. Juror Bias

In his second claim for relief, Petitioner asserts that he was denied his right to a trial by an impartial jury given the jury's improper discussion and consideration of Petitioner's conviction after his first trial. (ECF No. 1 at 3; ECF No. 1-1 at 13, 17–19). Petitioner raised the juror bias claim on direct appeal to the California Court of Appeal, Fifth Appellate District, which denied the claim in a reasoned decision. The California Supreme Court summarily denied Petitioner's petition for review. As federal courts review the last reasoned state court opinion, the

---

[13] Although the California Court of Appeal did not cite to any federal authority on this issue, the pertinent inquiry is whether it "reasonably applied the principles contained in relevant Supreme Court precedent." Parker v. Small, 665 F.3d 1143, 1148 n.1 (9th Cir. 2011) (citing Early v. Packer, 537 U.S. 3, 8 (2002)). The Supreme Court has noted that a state court is not required to cite or even be aware of its cases under § 2254(d). Early, 537 U.S. at 8.

Court will "look through" the California Supreme Court's summary denial and examine the decision of the California Court of Appeal. See Brumfield, 135 S. Ct. at 2276; Ylst, 501 U.S. at 806.

In denying the juror bias claim, the California Court of Appeal stated:

Even if we were to find misconduct, which we do not, an objective analysis of the statement establishes the statement does not show juror bias. To reverse the judgment we would have to find that either (1) the statement was inherently and substantially likely to have resulted in juror bias or (2) the nature of the statement was such that the totality of the circumstances makes it substantially likely that actual bias arose. (*Danks, supra,* 32 Cal.4th at p. 303.) This innocuous statement does not establish juror bias under either test.

First, the words themselves reflect a statement of fact, and not reference to an outside source of information. The juror apparently assumed the prior trial ended in a conviction, which was a reasonable conclusion based on the wording of the stipulation. That this court ordered a new trial to consider additional evidence would suggest to most lay persons, we suppose, that a judgment had been reversed. But these conclusions probably had been reached by each of the jurors who had considered the issue, either before or after the statement was made. Because each juror likely would reach the same conclusion, it is extremely unlikely that a juror uttering the words audibly established bias.

Second, if we view the matter from the standpoint of the juror making the statement, then the statement does not reflect any bias. That juror, it would appear, had concluded that Soojian was guilty and was somewhat piqued that a lone juror had not reached the same conclusion. Nor can the conclusion apparently argued by Soojian—that the statement established that the juror making the statement had formed an opinion before deliberations began— withstand analysis. From the context of the declaration, it is clear the statement was made after the jurors had deliberated for a period of time and after at least one vote on at least some of the charges had been taken. Therefore, the context of the declaration establishes the jury followed the trial court's instruction and considered all of the evidence before forming an opinion on guilt. This procedure is incompatible with the suggestion of juror bias. This same analysis would apply to any juror other than the holdout juror.

Third, if we view the matter from the context of the holdout juror, the same result is reached. The declaration does not state the holdout juror reacted to the statement in any manner, so there is no way to know if the holdout juror even heard the statement. Moreover, as explained above, the holdout juror likely had already reached the conclusion the first trial had ended in a guilty verdict.

Finally, that the juror was a holdout when the vote was taken strongly suggests he or she was not biased. To vote to find Soojian not guilty in light of the overwhelming DNA evidence, evidence for which Soojian could not provide a reasonable explanation, strongly suggests the holdout juror was as neutral as Soojian could hope or expect. The overwhelming DNA evidence would also explain the holdout juror's change in vote, if he or she later voted for guilt. Of course, we do not know if the juror changed his or her vote because the jury could not reach a verdict on the attempted murder charge and found Soojian not guilty of one of the assault charges. Therefore, the holdout juror may not have changed

his or her vote if the statement was made during consideration of these two counts.

The single statement on which Soojian relies does not constitute misconduct; nor does it remotely suggest juror bias. Accordingly, we reject Soojian's claim.

Soojian, 2014 WL 7340275, at *17–18.

"The Sixth Amendment guarantees criminal defendants a verdict by impartial, indifferent jurors. The bias or prejudice of even a single juror would violate [the] right to a fair trial." Dyer v. Calderon, 151 F.3d 970, 973 (9th Cir. 1998) (en banc) (citing United States v. Hendrix, 549 F.2d 1225, 1227 (9th Cir. 1977)). "[T]he presence of a biased juror introduces a structural defect not subject to harmless error analysis." Dyer, 151 F.3d at 973 n.2 (citing Arizona v. Fulminante, 499 U.S. 279, 307–10 (1991)). The courts have "analyzed juror bias under two theories—actual bias and implied bias." Estrada v. Scribner, 512 F.3d 1227, 1240 (9th Cir. 2008) (citing Fields v. Woodford, 309 F.3d 1095, 1103 (9th Cir. 2002)).

"Actual bias is, in essence, 'bias in fact—the existence of a state of mind that leads to an inference that the person will not act with entire impartiality.'" Estrada, 512 F.3d at 1240 (internal quotation marks omitted) (quoting United States v. Gonzalez, 214 F.3d 1109, 1112 (9th Cir. 2000)). Actual bias "stems from a pre-set disposition not to decide an issue impartially" and "is typically found when a prospective juror states that he can not be impartial, or expresses a view adverse to one party's position and responds equivocally as to whether he could be fair and impartial despite that view." Fields v. Brown, 503 F.3d 755, 766, 767 (9th Cir. 2007) (en banc).

"The determination of whether a juror is actually biased is a question of fact . . . ." Estrada, 512 F.3d at 1240 (citing Fields, 309 F.3d at 1103). "A state court's decision is based on unreasonable determination of the facts under § 2254(d)(2)[14] if the state court's findings are 'unsupported by sufficient evidence,' if the 'process employed by the state court is defective,' or 'if no finding was made by the state court at all.'" Hernandez v. Holland, 750 F.3d 843, 857 (9th

---

[14] A different provision of AEDPA provides that "a determination of a factual issue made by a State court shall be presumed to be correct." 28 U.S.C. § 2254(e)(1). The Ninth Circuit's "panel decisions appear to be in a state of confusion as to whether § 2254(d)(2) or (e)(1), or both, applies to AEDPA review of state-court factual findings," Murray v. Schriro, 745 F.3d 984, 1001 (9th Cir. 2014), and the Supreme Court has not addressed the relationship between § 2254(d)(2) and (e)(1), Wood v. Allen, 558 U.S. 290, 300 (2010). However, the Court "need not address the interaction between § 2254(d)(2) and (e)(1) when the petitioner's claims fail to satisfy either provision." Atwood v. Ryan, 870 F.3d 1033, 1047 (9th Cir. 2017) (citing Murray, 745 F.3d at 1001).

Cir. 2014) (quoting Taylor v. Maddox, 366 F.3d 992, 999 (9th Cir. 2004)). "While 'not impossible to meet,' that is a 'daunting standard—one that will be satisfied in relatively few cases,' especially because we must be 'particularly deferential to our state-court colleagues.'" Hernandez, 750 F.3d at 857 (quoting Taylor, 366 F.3d at 1000).

As set forth in section IV(B)(2), *supra*, this Court cannot consider the portions of the jurors' affidavits regarding any statement or discussion of Petitioner's first trial that occurred during the jury's deliberations. Further, the Supreme Court has "held that Rule 606(b)'s bar on jury deliberations evidence does not permit an exception for testimony about juror bias." United States v. Shiu Lung Leung, 796 F.3d 1032, 1035 (9th Cir. 2015) (citing Warger v. Shauers, 135 S. Ct. 521 (2014)). But see Pena-Rodriguez, 137 S. Ct. at 869 (holding "that where a juror makes a clear statement that indicates he or she relied on racial stereotypes or animus to convict a criminal defendant, the Sixth Amendment requires that the no-impeachment rule give way in order to permit the trial court to consider the evidence of the juror's statement").

Even if this Court could consider those portions of the jurors' affidavits, the California Court of Appeal's denial of Petitioner's juror bias claim was not based on an unreasonable determination of fact. In the instant case, there is no indication that the process employed by the state court was defective,[15] and there is sufficient evidence to support the California Court of Appeal's determination that there was no juror bias with respect to the statement made regarding Petitioner's first trial. The state court reasonably concluded that the statement did not reflect that the juror making the statement had formed an opinion before deliberations as the context strongly suggested the statement was made after the jurors had deliberated and taken at least one vote on the charges. The state court also reasonably concluded that the statement did not reflect that the holdout juror was biased against Petitioner given that at the time the statement was made he or she voted to find Petitioner not guilty. The statement at issue reflected a reasonable assumption based on the parties' stipulation at trial, and moreover, the jury found Petitioner not guilty of count 6, which undercuts the allegation of juror bias. Based on the foregoing, the state

---

[15] Petitioner's claim that the state court should have held an evidentiary hearing regarding the juror misconduct is addressed in section IV(B)(5), *infra*.

court's factual determinations with respect to actual bias were not unreasonable under § 2254(d)(2).

The Ninth Circuit has implied bias in "exceptional circumstances" and in "extreme situations where the relationship between a prospective juror and some aspect of the litigation is such that it is highly unlikely that the average person could remain impartial in his deliberations under the circumstances, or where repeated lies in voir dire imply that the juror concealed material facts in order to secure a spot on the particular jury." Fields, 503 F.3d at 766, 770 (internal quotation marks and citations omitted). However, as the "Supreme Court has never explicitly adopted or rejected the doctrine of implied bias," Hedlund v. Ryan, 854 F.3d 557, 575 (9th Cir. 2017), "it cannot be said, under AEDPA, there is 'clearly established' Supreme Court precedent addressing the issue before us, and so we must defer to the state court's decision," Moses v. Payne, 555 F.3d 742, 754 (9th Cir. 2009).

Based on the foregoing, the California Court of Appeal's denial of Petitioner's juror bias claim was not contrary to, or an unreasonable application of, clearly established federal law,[16] nor was it based on an unreasonable determination of fact. The state court's decision was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter, 562 U.S. at 103. Accordingly, Petitioner is not entitled to habeas relief on his second claim, and it should be denied.

4. Failure to Testify in Second Trial

In his third claim for relief, Petitioner asserts that the jury improperly discussed and considered the fact that Petitioner did not testify at trial. (ECF No. 1 at 3; ECF No. 1-1 at 28–38). Petitioner raised this juror misconduct claim on direct appeal to the California Court of Appeal, Fifth Appellate District, which denied the claim in a reasoned decision. The California Supreme Court summarily denied Petitioner's petition for review. As federal courts review the last reasoned state court opinion, the Court will "look through" the California Supreme Court's

---

[16] Although the California Court of Appeal did not cite to any federal authority on this issue, the pertinent inquiry is whether it "reasonably applied the principles contained in relevant Supreme Court precedent." Parker, 665 F.3d at 1148 n.1 (citing Early, 537 U.S. at 8). The Supreme Court has noted that a state court is not required to cite or even be aware of its cases under § 2254(d). Early, 537 U.S. at 8.

summary denial and examine the decision of the California Court of Appeal. See Brumfield, 135 S. Ct. at 2276; Ylst, 501 U.S. at 806.

In denying the juror misconduct claim regarding Petitioner's failure to testify at trial, the California Court of Appeal stated:

### Misconduct—Failure to Testify

Soojian also claims juror misconduct occurred when the jury discussed his failure to testify. Soojian again relies on the first declarations of Jurors Nos. 3 and 11 to support his argument. The relevant portions of Juror No. 3's first declaration state (1) Soojian did not testify, (2) the jury discussed Soojian's not testifying, and (3) one unidentified juror said words to the effect of "you don't want to testify if you're guilty."[17] The relevant portions of Juror No. 11's first declaration stated (1) the jury discussed Soojian's not testifying, (2) the jury discussed that it would have liked to hear from Soojian, and (3) an unidentified juror stated "you don't want to testify if you're guilty."

The second declarations of these two jurors contradicted those submitted by Soojian. Jurors Nos. 3 and 11 claimed in their second declarations that the declarations submitted by Soojian contained errors. Both jurors denied stating that a juror said words to the effect that a defendant would not want to testify if he was guilty, or equating Soojian's failure to testify as evidence of his guilt. Instead, both jurors stated any discussion related to Soojian's testimony was limited to a desire to hear his voice to see if it was a "deep voice" as described by Morgan in his phone call to the emergency operator.

The remaining jurors who signed declarations confirmed they did not hear anyone make a comment, such as a defendant would not testify if he was guilty. Nor did any juror recall any discussion about Soojian's failure to testify as being evidence of his guilt.

The trial court found there was no evidence to support Soojian's contention that Soojian's failure to testify was utilized by the jury to find him guilty. We understand this finding to be directed at the "you don't want to testify if you're guilty" comment attributed to an unidentified juror. Since this finding was supported by substantial evidence, we must accept it. (Ramos, supra, 34 Cal.4th at p. 519.) Accordingly, we reject Soojian's claim of jury misconduct as it relates to this alleged comment.

The declarations, however, raised two issues related to Soojian's failure to testify. While the declarations submitted by the People established that the jury did not rely on Soojian's failure to testify as evidence of guilt, several of the jurors also stated in their declarations that the jury discussed the desire to hear the tone of Soojian's voice so they could consider whether it was a deep voice as described by Morgan. Although there are several ways the tone of Soojian's voice could have been presented to the jury without having him testify, one method to do so would be if he testified. The discussion had by the jury, therefore, could be considered a discussion related to Soojian's failure to testify. If the discussion was related to Soojian's failure to testify, then misconduct would have occurred. (Leonard, supra, 40 Cal.4th at p. 1424.)

[17] We again ignore the portions of the declarations that are prohibited by Evidence Code section 1150, subdivision (a).

32

We need not decide whether misconduct occurred because, even if we assume there was misconduct, we have located three cases that convince us there was no juror bias.

In *Loker* the defendant moved for a new trial on the grounds that juror misconduct occurred in the penalty phase of the trial. One of the asserted grounds of misconduct was consideration during deliberations of the defendant's failure to testify. One juror stated in a declaration that "there 'was a consideration of remorse involving the fact that the Defendant did not testify,' " while another juror stated, " 'The fact that [defendant] did not take the stand was discussed as weighing heavily against him.' " (*Loker, supra,* 44 Cal.4th at p. 748.) The foreperson, however, stated in a declaration that whenever improper topics were brought up during deliberations, he reminded the jury that such topics could not be considered, and that the deliberations must be limited to the evidence submitted and the law provided by the trial judge. (*Ibid.*) When someone brought up the defendant's not testifying, the foreperson reminded the jury such topics were improper and directed them back to the evidence. (*Ibid.*) Several other jurors submitted declarations consistent with the foreperson's declaration. (*Ibid.*)

After concluding misconduct occurred because the jury violated the trial court's instruction to not discuss the defendant's failure to testify, the Supreme Court completed its analysis as follows: "We independently review the trial court's determination that defendant was not prejudiced by the improper comments. [Citation.] Here, we uphold the court's ruling. It is natural for jurors to wonder about a defendant's absence from the witness stand. [Citation.] The amended declarations show that the comments on this subject were brief and played no role in the jury's penalty deliberations. '[T]he purpose of the rule prohibiting jury discussion of a defendant's failure to testify is to prevent the jury from drawing adverse inferences against the defendant, in violation of the constitutional right not to incriminate oneself.' [Citation.] Even if some comments disclosed in the amended declarations might have given rise to inferences adverse to defendant, the foreperson promptly forestalled that possibility, reminding the jurors that defendant had a right not to testify and that his assertion of that right could not be held against him. Under these circumstances, the purpose of the rule against commenting on defendant's failure to testify was served, and the presumption of prejudice is rebutted." (*Loker, supra,* 44 Cal.4th at p. 749.)

In *Leonard* the declarations submitted in support of the defendant's motion for new trial included a statement by one juror that "[d]uring penalty phase deliberations, several jurors, myself included, expressed the opinion that we would have liked for [defendant] to testify during the penalty phase so that we could better understand why he killed six people, and whether he was truly remorseful." (*Leonard, supra,* 40 Cal.4th at p. 1424.) Another juror stated jurors "discussed the fact that we would like to have heard [defendant] testify during the penalty phase so that we could better know him and understand the extent of his impairment. We discussed the fact that we would have liked to have heard [defendant's] reasons for committing the crimes as we felt this was not satisfactorily answered through the testimony of defense expert witnesses." (*Ibid.*)

After concluding the jury had committed misconduct by violating the instruction to not consider the defendant's failure to testify during deliberations, the Supreme Court stated, "This misconduct gives rise to a presumption of prejudice, which 'may be rebutted ... by a reviewing court's determination, upon examining the entire record, that there is no substantial likelihood that the complaining party suffered actual harm.' [Citations.]" (*Leonard, supra,* 40 Cal.4th at p. 1425.)

In applying its independent judgment, the Supreme Court stated, "[T]he purpose of the rule prohibiting jury discussion of a defendant's failure to testify is to prevent the jury from drawing adverse inferences against the defendant, in violation of the constitutional right not to incriminate oneself. Here, the comments on defendant's failure to testify mentioned in defendant's new trial motion merely expressed regret that defendant had not testified, because such testimony might have assisted the jurors in understanding him better. In the words of the trial court: 'I think that wanting to hear defendants testify is natural. We do the best we can to deter jurors from speculating and from drawing negative inferences, but merely referencing that they wish he would have testified is not the same as punishing the Defendant for not testifying. It is not the same as drawing negative inferences from the absence of testimony.' We conclude there is no substantial likelihood that defendant was prejudiced by the jury's brief discussion of his failure to testify at the penalty phase." (*Leonard, supra,* 40 Cal.4th at p. 1425.)

Finally, this court addressed a similar issue in *People v. Hord, supra,* 15 Cal.App.4th 711 (*Hord* ). Hord was convicted of continuous sex abuse of a child (§ 288.5) and lewd and lascivious acts against a minor (§ 288, subd. (b)) for acts committed against his stepdaughter. Hord moved for a new trial on the grounds of juror misconduct. To support his motion, Hord filed declarations from two jurors. Juror A.B. stated the fact Hord did not testify was discussed. A juror said "you don't say anything to protect yourself." (*Hord,* at p. 721.) When approached after the trial and asked about the verdict, Juror A.B. told family members the jury was against Hord because he did not testify. Juror V.J. stated in a declaration that several jurors discussed the fact Hord did not testify. (*Ibid.*)

The People's opposition to the motion included declarations from each juror. Juror A.B. stated Hord's not testifying was mentioned but not discussed. After reaching a verdict on one count, someone made a comment about how things might have been different had Hord testified. (*Hord, supra,* 15 Cal.App.4th at p. 722.) Juror V.J. confirmed that during deliberations a comment was made about Hord not testifying. This juror also stated, "[I]n my opinion that if a man did not do what he was accused of he should say so." (*Ibid.*)

The foreperson stated in his declaration that a comment was made during deliberations "as to why the defendant did not take the stand. [¶] ... I, being the foreman of the jury, interrupted and informed the jury that whether the defendant testified or not had no bearing on his guilt or innocence. This was not to be used in our decision making process. Any further discussion or talk whatsoever regarding testimony of the defendant was stopped." (*Hord, supra,* 15 Cal.App.4th at p. 722.) Five jurors did not recall a comment about Hord's failure to testify. Three of the jurors who recalled a comment about Hord not testifying also recalled the foreman telling the other jurors such information could not be considered. (*Ibid.*)

We recognized that misconduct occurred because the jury discussed Hord's failure to testify and then turned to the issue of juror bias.[18] (*Hord, supra,* 15 Cal.App.4th at p. 725.)

> "When jury deliberations have been infiltrated with a matter which is prohibited, one must look at the nature of what has improperly infiltrated the procedure and the possibility of prejudice.... [¶] ... [¶]

---

[18] We also found misconduct because the jury discussed the possible sentence that would be imposed if Hord were found guilty. (*Hord, supra,* 15 Cal.App.4th at p. 725.) This issue is not relevant to our discussion.

"Where the misconduct is not 'inherently likely' to have affected the vote of any of the jurors, prejudice is not shown. [Citations.] ...

"Here, during deliberations there was a comment or comments made about defendant's not testifying and a comment regarding defendant's sentence. Although these matters were not to be discussed, the discussion was very different than when a juror performs experiments or brings in new law or facts into deliberations. The jury was obviously well aware here that defendant did not testify and equally aware that he would be punished if the jury found him to be guilty. Thus the comments did not interject any new material into deliberations that was not already known by the jury from the trial itself. Transitory comments of wonderment and curiosity, although misconduct, are normally innocuous, particularly when a comment stands alone without any further discussion. The fact that only some of the jurors recalled the comments tends to indicate that this was not a discussion of any length or significance.

"When comments go beyond natural curiosity and their content suggests inferences from forbidden areas, the chance of prejudice increases. For example, if a juror were to say, 'The defendant didn't testify so he is guilty,' or 'we will have to find the defendant guilty of the greatest charges to ensure he will be adequately punished,' the comments go beyond mere curiosity and lean more toward a juror's drawing inappropriate inferences from areas which are off limits. Such comments are more likely to influence that juror and other jurors.

"In [Juror A.B.'s] initial declaration, he recited a juror's oblique remark about a party not saying anything to protect himself. Although this comment may have carried a greater potential for prejudice than a mere statement of curiosity, in light of the record before us it does not require reversal. It does not appear that there was a lengthy discussion about the two inappropriate areas or that there was a movement to disobey the court's instructions. The comments did not involve extra record material but were regarding matters already obvious to the jurors. More importantly, the foreperson admonished his fellow jurors and reminded them they could not consider defendant's not testifying during deliberations. [¶] ... [¶]

"Here, forbidden elements inadvertently crept into jury discussions. However, there is no substantial likelihood that defendant suffered actual harm." (*Hord, supra,* 15 Cal.App.4th at pp. 727–728.)

These cases confirm that there was not a substantial likelihood of juror bias. The jurors in this trial were not wondering why Soojian did not testify, which is normally innocuous, but instead merely observed that hearing the tone of his voice would have provided more relevant evidence. There was no evidence the issue played any role in deliberations. The comments appear to have been brief, and not every juror recalled the comments, suggesting they were not significant. There was no evidence the jury agreed to ignore the trial court's instructions, nor evidence of a lengthy discussion. Nor was this a situation where experiments or outside evidence was brought before the jury. No one suggested Soojian must be guilty because the jury did not hear him speak. It was simply an observation that additional evidence could have been produced, but it was not an indication the jurors decided the case on anything other than the

evidence that was presented to it. Since there was no evidence of bias, we reject this argument.

Soojian, 2014 WL 7340275, at *18–21 (footnotes in original).

The Court finds that it cannot consider the portions of the jurors' affidavits regarding discussion of the fact that Petitioner did not testify at trial. The Ninth Circuit has specifically addressed this issue, holding:

> The fact that Petitioner did not testify in his own defense is not extrinsic evidence. Although the jury's discussion of this issue clearly violated the trial court's instructions, what happened (or did not happen) in the courtroom was a part of the trial, not extrinsic to it. We may not inquire into a jury's deliberations concerning the evidence at trial.

Raley v. Ylst, 470 F.3d 792, 803 (9th Cir. 2006) (citations omitted).

Even if this Court could consider those portions of the jurors' affidavits, the California Court of Appeal's denial of Petitioner's juror misconduct claim based on discussion of Petitioner's failure to testify was not contrary to, or an unreasonable application of, clearly established federal law, nor was it based on an unreasonable determination of fact. There was sufficient evidence to support the state court's denial of juror misconduct based on the "you don't want to testify if you're guilty" statement attributed to an unidentified juror in light of Jurors Nos. 3 and 11's second declarations and given that the other jurors did not recall hearing such a statement. (4 CT 967, 970, 974, 977, 980, 983, 986, 989, 992, 995, 999). The state court reasonably concluded that the other comments reflected an observation that hearing the tone of Petitioner's voice would have provided additional relevant evidence rather than an inference of guilt for Petitioner's failure to testify.

Based on the foregoing, the California Court of Appeal's denial of the juror misconduct claim was not contrary to, or an unreasonable application of, clearly established federal law,[19] nor was it based on an unreasonable determination of fact. The state court's decision was not "so lacking in justification that there was an error well understood and comprehended in existing law

---

[19] Although the California Court of Appeal did not cite to any federal authority on this issue, the pertinent inquiry is whether it "reasonably applied the principles contained in relevant Supreme Court precedent." Parker, 665 F.3d at 1148 n.1 (citing Early, 537 U.S. at 8). The Supreme Court has noted that a state court is not required to cite or even be aware of its cases under § 2254(d). Early, 537 U.S. at 8.

beyond any possibility for fairminded disagreement." <u>Richter</u>, 562 U.S. at 103. Accordingly, Petitioner is not entitled to habeas relief on his third claim, and it should be denied.

5. <u>Evidentiary Hearing</u>

Petitioner also asserts that the trial court should have conducted an evidentiary hearing to resolve factual conflicts. (ECF No. 1-1 at 35). Petitioner raised this evidentiary hearing claim on direct appeal to the California Court of Appeal, Fifth Appellate District, which denied the claim in a reasoned decision. The California Supreme Court summarily denied Petitioner's petition for review. As federal courts review the last reasoned state court opinion, the Court will "look through" the California Supreme Court's summary denial and examine the decision of the California Court of Appeal. <u>See</u> <u>Brumfield</u>, 135 S. Ct. at 2276; <u>Ylst</u>, 501 U.S. at 806.

In denying Petitioner's evidentiary hearing claim, the California Court of Appeal stated:

> Soojian also asserts the trial court erred when it denied his request for an evidentiary hearing to resolve the contradictions in the declarations executed by Jurors Nos. 3 and 11. "The trial court has the discretion to conduct an evidentiary hearing to determine the truth or falsity of allegations of jury misconduct, and to permit the parties to call jurors to testify at such a hearing. [Citation.] Defendant is not, however, entitled to an evidentiary hearing as a matter of right. Such a hearing should be held only when the court concludes an evidentiary hearing is 'necessary to resolve material, disputed issues of fact.' [Citation.] 'The hearing should not be used as a "fishing expedition" to search for possible misconduct, but should be held only when the defense has come forward with evidence demonstrating a strong possibility that prejudicial misconduct has occurred. Even upon such a showing, an evidentiary hearing will generally be unnecessary unless the parties' evidence presents a material conflict that can only be resolved at such a hearing.' [Citations.] [¶] We review for abuse of discretion the trial court's denial of defendant's postverdict request for an evidentiary hearing into allegations of jury misconduct.' [Citation.]" (*People v. Avila* (2006) 38 Cal.4th 491, 604.)
>
> The trial court impliedly denied Soojian's motion for an evidentiary hearing to resolve material factual conflicts. Soojian, however, has failed to identify any material factual conflicts that would require an evidentiary hearing. Soojian suggests, as best we can discern, that Juror No. 10's declaration supports the contention that Soojian's failure to testify adversely affected the juror's determination on the issue of guilt. We have reviewed this declaration and it does no such thing. The declaration states the juror wanted to hear Soojian speak to determine if he had a deep voice, an issue several juror's mentioned. The declaration next states the juror "personally did not consider whether [Soojian] testified to determine if he was guilty because that is not part of the facts we were to consider." This sentence is apparently the basis for this argument. If so, it is a blatant misrepresentation of the record. The sentence specifically states that the juror did not consider Soojian's failure to testify when determining guilt. More importantly, the statement describes the thought process of the juror and is inadmissible. (Evid.Code, § 1150, subd. (a).)

Soojian also misconstrues the second declaration filed by Juror No. 11. Soojian asserts this declaration suggested the jury relied on Soojian's failure to testify when deciding the issue of guilt. It did not. Instead, the declaration states, "There was no discussion during deliberations equating [Soojian's] failure to testify as evidence of his guilt. That never happened." It is difficult to imagine a more definitive example of a juror denying the jury relied on the failure to testify as evidence of guilt.

The trial court is required to hold an evidentiary hearing only if (1) a hearing is necessary to resolve material disputed issues of fact, and (2) there is evidence demonstrating a strong possibility that prejudicial misconduct has occurred. Soojian has not met either prong. Accordingly, the trial court did not abuse its discretion by failing to hold an evidentiary hearing.

Soojian, 2014 WL 7340275, at *22.

The two Supreme Court cases implicated by Petitioner's evidentiary hearing claim are Remmer v. United States, 347 U.S. 227 (1954), and Smith v. Phillips, 455 U.S. 209 (1982). In Remmer, a juror in a federal criminal trial was contacted by a third party who communicated that the juror could profit by bringing in a verdict favorable to the defendant. 347 U.S. at 228. The juror reported the incident to the trial judge, who discussed it with the prosecutors but not the defense. The Federal Bureau of Investigation was requested to investigate and based on the ensuing report, the trial judge and prosecutors concluded that the statement was made in jest. The defense learned about the incident after the jury returned its verdict and moved for a new trial. The district court denied the motion without holding a hearing. Id. at 228–29. The Supreme Court reversed, finding that the "trial court should not decide and take final action *ex parte* on information such as was received in this case, but should determine the circumstances, the impact thereof upon the juror, and whether or not it was prejudicial, in a hearing with all interested parties permitted to participate." Id. at 229–30.

Smith involved a juror in a state criminal trial who, during the trial, applied for an investigator position in the state prosecutor's office. 455 U.S. at 212. Although the prosecuting attorneys knew of the juror's application, they chose not to inform the court or the defense until after the jury returned the verdict. Id. at 212–13. After holding a hearing in which the juror and prosecutors testified, the trial court denied the defendant's motion to vacate his conviction, finding that the juror was not biased and that the evidence did not suggest a "sinister or dishonest motive" on the part of the prosecutors. Id. at 213–14. The Supreme Court reversed the lower

federal court's grant of habeas relief, finding that the trial court's hearing was sufficient to comply with due process. Id. at 217–18.

The Ninth Circuit has "interpreted <u>Smith</u> and <u>Remmer</u> as providing a flexible rule." <u>Tracey v. Palmateer</u>, 341 F.3d 1037, 1044 (9th Cir. 2003). "<u>Remmer</u>'s command that hearings are warranted in *every* case is unique to the tampering context," and "<u>Smith</u> leaves open the door as to whether a hearing is always required and what else may be 'sufficient' to alleviate any due process concerns" Id. Thus, "[a]n evidentiary hearing is not mandated *every* time there is an allegation of jury misconduct or bias." Id. (alteration in original) (quoting <u>United States v. Angulo</u>, 4 F.3d 843, 847 (9th Cir. 1993)). Rather, <u>Remmer</u> requires a hearing when there is presumptively prejudicial improper contact between a juror and an outside party yet the state does not prove harmlessness and the prejudicial effect of the communications is unclear from the existing record. <u>Godoy v. Spearman</u>, 861 F.3d 956, 962, 966 (9th Cir. 2017) (en banc).

In <u>Tracey</u>, the Ninth Circuit held that a state court's refusal to question a juror further about the names of two other jurors who spoke negatively about the defendant and to take additional testimony from those two jurors was not contrary to, or an unreasonable application of, Supreme Court precedent. 341 F.3d at 1044. The Ninth Circuit noted that although an evidentiary hearing was not required, the state court did in fact hold a hearing on the record with the parties present, and its decision not to hold a more in-depth hearing "was the kind of discretionary inquiry best left to the sound judgment of the trial judge." Id. at 1045.

Petitioner argues that an evidentiary hearing was necessary to resolve material factual conflicts given that "[f]ive jurors insisted that there was no discussion of Petitioner's decision not to testify. Two jurors initially said that jurors expressly said during deliberations that the fact that Petitioner did not testify indicated guilt. Six jurors provided declarations suggesting that Petitioner's failure to testify was construed against him." (ECF No. 1-1 at 36). The California Court of Appeal held that the trial court did not err in impliedly denying Petitioner's motion for an evidentiary hearing because there were no material factual conflicts that would require such a hearing. As set forth in section IV(B)(4), *supra*, this Court cannot consider the portions of the jurors' affidavits regarding any statement or discussion of Petitioner's failure to testify that

occurred during the jury's deliberations. Even if this Court could consider those portions of the jurors' affidavits, the California Court of Appeal's denial of Petitioner's evidentiary hearing claim was not contrary to, or an unreasonable application of, clearly established federal law, nor was it based on an unreasonable determination of fact.

In support of this claim, Petitioner relies on Juror No. 10's declaration, which Petitioner describes as "expressly stat[ing] . . . that Petitioner's failure to testify adversely affected the verdict. (ECF No. 1-1 at 35) Petitioner also contends that Juror No. 11's second declaration "corroborated Juror No. 10's declaration . . . that jurors considered Petitioner's failure to testify as favoring conviction." (ECF No. 1-1 at 36). However, the record refutes Petitioner's argument. Juror No. 10 declared in pertinent part:

> There was a discussion about Defendant testifying in the context of determining if he had a deep voice. We wanted to hear his voice because if he did not have a deep voice, then maybe it was not him.
>
> I personally did not consider whether Defendant testified to determine if he was guilty because that is not part of the facts we were to consider.

(4 CT 996). Juror No. 11 declared that "[t]here was no discussion during deliberations equating defendant's failure to testify as evidence of his guilt. That never happened." (4 CT 999). Juror No. 11 further declared, "I did not consider whether Mr. Soojian testified to determine his guilt; [t]here was a lot of other evidence to support a verdict for guilt." (Id.).

Based on the foregoing, the California Court of Appeal's denial of Petitioner's evidentiary hearing claim was not contrary to, or an unreasonable application of, clearly established federal law,[20] nor was it based on an unreasonable determination of fact. Remmer and Smith do not mandate an evidentiary hearing whenever there is an allegation of jury misconduct or bias, and "Smith leaves open the door as to . . . what else may be 'sufficient' to alleviate any due process concerns." Tracey, 341 F.3d at 1044. The state court's denial of the evidentiary hearing claim was not "so lacking in justification that there was an error well

---

[20] Although the California Court of Appeal did not cite to any federal authority on this issue, the pertinent inquiry is whether it "reasonably applied the principles contained in relevant Supreme Court precedent." Parker, 665 F.3d at 1148 n.1 (citing Early, 537 U.S. at 8). The Supreme Court has noted that a state court is not required to cite or even be aware of its cases under § 2254(d). Early, 537 U.S. at 8.

understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter, 562 U.S. at 103. Accordingly, Petitioner is not entitled to habeas relief on the ground that the trial court erred in failing to hold an evidentiary hearing.

### B. **Miranda Error and Judicial Estoppel**

In his fourth claim for relief, Petitioner asserts that he was subjected to custodial interrogation without Miranda warnings and that the prosecutor improperly used Petitioner's invocation of his constitutional rights against Petitioner at trial. (ECF No. 1-1 at 41, 45). Respondent argues that the state courts reasonably rejected Petitioner's Miranda claim. (ECF No. 20 at 39).

Petitioner raised his Miranda claim on direct appeal to the California Court of Appeal, Fifth Appellate District, which denied the claim in a reasoned decision. The California Supreme Court summarily denied Petitioner's petition for review. As federal courts review the last reasoned state court opinion, the Court will "look through" the California Supreme Court's summary denial and examine the decision of the California Court of Appeal. See Brumfield, 135 S. Ct. at 2276; Ylst, 501 U.S. at 806.

In denying Petitioner's Miranda claim, the California Court of Appeal stated:

Soojian moved before trial to exclude any statements he made at his mobilehome before he was arrested. The statements were in response to questions asked by Oh before Soojian was placed under arrest.

To summarize the relevant testimony, investigating detectives presented a photo lineup to Joyce to see whether she could identify the perpetrator. A DMV photo of Soojian was included in the photo lineup because of the work order recovered from the scene with Joyce's blood on it. When Joyce identified Soojian as the perpetrator, the investigating detectives went to Soojian's mobilehome to speak with him.

The facts surrounding the questioning of Soojian came from the hearing held before trial when both sides made motions regarding this issue. Oh testified to the facts summarized above that that led him and the other officers to Soojian's mobilehome. Oh and his partner were in plain clothes, with each displaying a badge and carrying an exposed firearm. Kandarian, who also was at the mobilehome, was similarly attired. The patrol officers wore standard uniforms. The five officers arrived simultaneously in three vehicles. No vehicle had activated its lights or sirens. Although this was a rural area, nearby were the residences of Bolin and Soojian's mother and father.

Soojian's pickup was parked in front of his mobilehome. Oh parked his vehicle behind Soojian's pickup, and the other vehicles parked behind Oh's vehicle. It

appears probable the two patrol officers walked to the perimeter and positioned themselves to determine if someone tried to leave through the back of the mobilehome.

As Oh walked past Soojian's pickup, he observed a rope and bridle in the bed of the pickup. As Oh approached the mobilehome, he saw the front door was open, but a screen door was in place. Oh asked Soojian, whom he could see inside the mobilehome, to come outside. Soojian, who was on the phone, came out shortly after Oh's request. Oh, Soojian, and Soojian's son stepped off the porch. Soojian made another phone call. Oh waited to speak with Soojian until that call was completed. Shortly thereafter, Bolin arrived and took custody of Soojian's son.

When Soojian completed his second phone call, Oh asked Soojian if he was surprised the police had arrived. Soojian responded, "No." Oh asked Soojian if he wanted to talk with him and Soojian responded, "No." When asked if he was home that morning, Soojian stated he did not want to answer. Soojian admitted the pickup belonged to him, but refused to answer when Oh asked him if he had let anyone else drive the vehicle. Oh then told Soojian the pickup had been involved in a crime, and Soojian refused to answer any more questions. Oh asked Soojian if he would permit a search of the pickup and the mobilehome, but Soojian would not consent to the searches. At this point Oh instructed one of the patrol officers to arrest Soojian.

Oh described the interchange as follows: "Nothing has changed. He's still standing there. We are just having a conversation in the front yard, and I'm just trying to determine whether or not he wants to cooperate and talk with me." Soojian was calm and polite during the exchange. No one touched Soojian, no one drew their firearm, Soojian was not placed in handcuffs until he was arrested, and Soojian was never accused of a crime. When Oh arrived at the mobilehome, he thought he had probable cause to make an arrest.

Soojian testified on his behalf at this hearing. His testimony essentially was consistent with Oh's, with a few exceptions. Soojian testified the police vehicles blocked his only exit from the mobilehome in his pickup. He also testified another police vehicle was on the canal bank overlooking the mobilehome. Several peace officers had their firearms drawn, and there was a sniper on the canal bank. When Soojian heard his name called, he did not feel he could leave. Soojian saw at least two pistols pointed at him, so he knew the officers were not there to talk to him. Soojian thought they were there related to a dispute he had had with his wife and mother-in-law regarding custody of his son.

Royce Gilbert, Soojian's grandmother, testified she lived in the same area as Soojian. On the date Soojian was arrested, Gilbert saw four police cars driving fast, apparently towards Soojian's mobilehome. Gilbert got into her car with her grandson and drove towards Soojian's mobilehome to see what was going on. As she approached, she saw a police car with two doors open and one officer pointing a firearm at Soojian's mobilehome. Gilbert stopped for a few seconds and then drove to the other side of the driveway that led to Soojian's mobilehome. There were sheriff's vehicles blocking the driveway, so Soojian could not have left.

The People recalled several witnesses in rebuttal. Oh testified there was not a sniper on the canal bank. Kandarian recalled the atmosphere at the time was very calm and not confrontational. Kandarian did not recall any officer having a firearm withdrawn. Lopez testified the atmosphere was not confrontational and

recalled he did not draw his weapon on that day.

The trial court recognized the issue was whether Soojian was in custody when he made the statements to Oh. The court found the evidence to be that Oh arrived at Soojian's mobilehome with two plain-clothed detectives and two patrol officers. Oh called out through the screen door for Soojian to come outside. Soojian exited the mobilehome after a second request by Oh. Soojian completed two phone calls before speaking with Oh. Soojian was not searched for weapons, was not handcuffed, and was not ordered to refrain from moving. The questions asked by Oh were not accusatory and were made in a polite tone of voice. No one was between Soojian and his residence. The trial court found unbelievable the testimony of Soojian and Gilbert that an officer had his gun drawn and that there was a sniper pointing a gun at Soojian.

The trial court concluded that a reasonable person would not have felt restrained to the degree associated with an arrest. Specifically, a reasonable person would not have felt he was under arrest when he was free to make phone calls before speaking with the officers. Accordingly, since Soojian was not restrained, Oh was not required to advise Soojian of his constitutional rights before asking him questions, and Soojian's answers were therefore admissible.

*Miranda* held that statements made by a defendant, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant may not be introduced into evidence unless the People establish the defendant was advised of his privilege against self-incrimination. (*People v. Thomas* (2011) 51 Cal.4th 449, 476 (*Thomas* ).) "Custodial interrogation" means " 'questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.' " (*Id.* at pp. 476–477.) "Custody consists of a formal arrest or a restraint on freedom of movement of the degree associated with a formal arrest. [Citation.]" (*People v. Moore* (2011) 51 Cal.4th 386, 395 (*Moore* ).) "Whether a person is in custody is an objective test; the pertinent question being whether the person was formally arrested or subject to a restraint on freedom of movement of the degree associated with a formal arrest. [Citation.] '[C]ustody must be determined based on how a reasonable person in the suspect's situation would perceive his circumstances.' [Citation.]" (*People v. Linton* (2013) 56 Cal.4th 1146, 1167.)

We look to all of the circumstances of the interrogation when making our inquiry, including the location, the length and form of the interrogation, the degree to which the investigation was focused on the defendant, and whether any indicia of arrest were present. (*Moore, supra,* 51 Cal.4th at p. 395.)

When conducting our review of *Miranda* claims, we are required to " 'accept the trial court's resolution of disputed facts and inferences, and its evaluations of credibility, if supported by substantial evidence. We independently determine from the undisputed facts and the facts properly found by the trial court whether the challenged statement was illegally obtained.' " (*Thomas, supra,* 51 Cal.4th at p. 476.)

Our summary of the testimony establishes there was substantial evidence to support each of the trial court's factual findings. Accordingly, we accept the facts as determined by the trial court as true. Therefore, the facts before us are that no peace officer drew a firearm during the events leading to Soojian's arrest, the conversation between Soojian and Oh was cordial, and Soojian's ability to walk to his mobilehome was not impaired during the conversation.

We now must apply our independent evaluation to these facts to determine if a reasonable person would not have felt he or she was at liberty to terminate the interrogation and leave. (*People v. Ochoa* (1998) 19 Cal.4th 353, 402.) In our view, a reasonable person in Soojian's position would have felt free to end the questioning and leave.

The discussion between Soojian and Oh took place at Soojian's mobilehome, and the trial court found his ability to return to the mobilehome was not impaired. Soojian was asked to come out of the mobilehome, not ordered to do so. Soojian came out with his son and made two phone calls before he spoke with Oh. The ability to make two phone calls before speaking with Oh is inconsistent with an arrest. The discussion was cordial, no firearms were drawn, and Soojian was not arrested at the time the questions were asked. Nor were the questions accusatory. Instead, the questions were neutral inquiries that did not suggest Soojian had committed a crime. Oh asked only a very few questions because of Soojian's refusal to talk with him. Other than the number of police officers present, nothing about the exchange would lead one to believe he was in custody. While there were five officers present, only Oh spoke with Soojian, while the other officers remained a distance away from the two. The testimony did not indicate any attempt to intimidate Soojian through either words or actions.

These facts lead to the inescapable conclusion that Soojian was not detained at the time Oh asked the questions in front of the mobilehome. Because Soojian had the ability to end the interview and leave, Oh was not required to advise Soojian of his constitutional rights before questioning him.

The cases cited by Soojian do not support his argument. Indeed, most of the cases stand for propositions of law that are not in dispute. He fails to cite any case with similar facts that would suggest he was in custody for *Miranda* purposes when he was questioned by Oh. For example, *Stansbury v. California* (1994) 511 U.S. 318 concerned the issue of whether a peace officer's subjective intent was relevant to the custody inquiry. *Stansbury* held, consistent with prior authority, the unexpressed subjective intent of a peace officer is not relevant to the issue. (*Id.* at p. 324.) Also inapposite is *Berkemer v. McCarty* (1984) 468 U.S. 420, which addressed the question of whether *Miranda* applied to misdemeanor traffic offenses and whether the case applied to motorists detained for traffic violations. (*Berkemer,* at pp. 422–423.) Neither issue is relevant to the issues here. The failure to provide any relevant case law that supports Soojian's argument confirms our conclusion that *Miranda* did not apply to the questioning in this case.

Soojian also argues the trial court's ruling violated his constitutional right to remain silent. The argument, as we understand it, was that when Soojian told Oh he did not want to talk with him, refused to state where he was the previous evening, and refused to state whether he had lent his pickup to anyone the previous night, Soojian was asserting his Fifth Amendment right to not incriminate himself. Because he was asserting his constitutional rights, Soojian argues Supreme Court precedent precluded the prosecution from introducing such evidence or commenting on his silence.

The first difficulty with this argument is that Soojian never stated he was refusing to answer any question on the ground that the answer might incriminate him. Nor did Soojian state in this brief exchange that he wanted to speak with an attorney before answering any questions. Soojian simply refused to answer specific

questions while choosing to answer other questions. We have not located any authority, nor has Soojian, for the proposition that selectively answering questions equates to an invocation of the right to remain silent.

The second difficulty with this argument is that the authority cited by Soojian is inapposite. He cites as legal authority *U.S. v. Bushyhead* (9th Cir. 2001) 270 F.3d 905 and *U.S. v. Whitehead* (9th Cir. 2000) 200 F.3d 634. But both of these cases involved custodial interrogations, not noncustodial interrogations. As explained above, Soojian was not in custody at the time he answered Oh's questions.

The third difficulty with this argument is that the United States Supreme Court recently held that under these facts the prosecution had the right to use this evidence against Soojian. In *Salinas v. Texas* (2013) ___ U.S. ___ [133 S.Ct. 2174], the Supreme Court held in a plurality opinion that the defendant's Fifth Amendment rights were not violated when the defendant remained silent when asked certain questions during a precustody and pre-*Miranda* interview. While the defendant answered most questions, he remained silent when asked if ballistics testing would establish that shell casings from the crime scene would match the defendant's firearm. The prosecutor argued the defendant's silence suggested he was guilty. The plurality opinion concluded that because the defendant did not "expressly invoke the privilege against self-incrimination in response to the officer's question," the Fifth Amendment claim failed. (*Salinas,* at p. ___ [133 S.Ct. at p. 2178] (plur. opn. of Alito, J.).) While the plurality opinion only garnered three votes, two other justices concurred in the opinion but did so on the grounds that precustodial silence did not give rise to self-incriminating testimony, even if Salinas had invoked his Fifth Amendment rights. (*Salinas,* at p. ___ [133 S.Ct. at p. 2184] (conc. opn. of Thomas, J.).)

Since Soojian is in the exact same factual position as the defendant in *Salinas* (noncustodial and pre-*Miranda* questioning), and he did not expressly invoke his right to silence, we must reject Soojian's argument.

Soojian, 2014 WL 7340275, at *22–26.

1. Custodial Interrogation

In Miranda v. Arizona, 384 U.S. 436 (1966), the United State Supreme Court held that before a suspect can be subjected to custodial interrogation, he must be warned "that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." Id. at 479. Miranda described "custodial interrogation" as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Id. at 444.

The Supreme Court has "repeatedly emphasized" that "whether a suspect is 'in custody'

is an objective inquiry." J.D.B. v. North Carolina, 564 U.S. 261, 270 (2011).

> Two discrete inquiries are essential to the determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was at liberty to terminate the interrogation and leave. Once the scene is set and the players' lines and actions are reconstructed, the court must apply an objective test to resolve the ultimate inquiry: was there a formal arrest or restraint on freedom of movement of the degree associated with formal arrest.

Thompson v. Keohane, 516 U.S. 99, 112 (1995) (internal quotation marks, alteration, and footnote omitted). Thus, "the subjective views harbored by either the interrogating officers or the person being questioned" are not relevant. Stansbury v. California, 511 U.S. 318, 323 (1994) (per curiam). "Courts must examine 'all of the circumstances surrounding the interrogation' and determine 'how a reasonable person in the position of the individual being questioned would gauge the breadth of his or her freedom of action.'" Yarborough v. Alvarado, 541 U.S. 652, 663 (2004) (quoting Stansbury, 511 U.S. at 322, 325).

The California Court of Appeal accepted the following facts as determined by the trial court as true: "no peace officer drew a firearm during the events leading to Soojian's arrest, the conversation between Soojian and Oh was cordial, and Soojian's ability to walk to the mobilehome was not impaired during the conversation." Soojian, 2014 WL 7340275, at *25. Although there was conflicting testimony from Petitioner and his grandmother, multiple officers testified that they did not draw their firearms or see other officers draw their firearms. (1 RT 65, 79, 100–03, 133; 2 RT 337, 396–97). Petitioner did not dispute the cordiality of the conversation between him and Detective Oh. (1 RT 105–33). Although Petitioner testified that the police vehicles blocked his ability to leave the property in his car, (1 RT 117), there was no evidence that Petitioner's ability to walk back into the mobilehome was impeded. There is no indication that the process employed by the state court was defective, and as set forth above, there is sufficient evidence to support the California Court of Appeal's findings of fact. Accordingly, the state court's factual determinations were not unreasonable under § 2254(d)(2).

Further, the state court's determination that under these facts Petitioner was not "in custody" for purposes of Miranda was not objectively unreasonable. The Miranda custody test is general, and the "more general the rule, the more leeway courts have in reaching outcomes in

case-by-case determinations." <u>Alvarado</u>, 541 U.S. at 665, 664. On one hand, certain facts weigh against finding that Petitioner was in custody. The interaction occurred right by Petitioner's mobilehome, Petitioner completed two phone calls before speaking with the waiting detective, and no one physically impeded Petitioner's ability to walk back into the mobilehome. Conversely, other facts weigh in favor of finding that Petitioner was in custody. For example, at some point during the conversation there were five law enforcement officers present and Petitioner was not informed that he was free to terminate the conversation. (1 RT 50–51, 65, 83, 123). In light of these "differing indications," <u>Alvarado</u>, 541 U.S. at 665, the state court's determination that Petitioner was not "in custody" for purposes of <u>Miranda</u> was not contrary to, or an unreasonable application of, clearly established federal law. The determination was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." <u>Richter</u>, 562 U.S. at 103. Accordingly, Petitioner is not entitled to habeas relief on this ground.

2.  <u>Use of Petitioner's Invocation of Constitutional Rights</u>

Although the Supreme Court granted certiorari in <u>Salinas v. Texas</u>, to determine "whether the prosecution may use a defendant's assertion of the privilege against self-incrimination during a noncustodial police interview as part of its case in chief," that question was left unanswered because the Court found that the petitioner did not invoke the privilege. 570 U.S. 178, 183 (2013) (plurality opinion). <u>Salinas</u> involved a noncustodial interview that lasted for approximately one hour and during which Salinas was not read <u>Miranda</u> warnings. For most of the interview, Salinas answered the officer's questions. However, Salinas did not answer when asked whether his shotgun would match the shells recovered at the scene of the crime. "Instead, petitioner looked down at the floor, shuffled his feet, bit his bottom lip, clenched his hands in his lap, and began to tighten up. After a few moments of silence, the officer asked additional questions, which petitioner answered." <u>Salinas</u>, 570 U.S. at 182 (internal quotation marks, brackets, and citations omitted). At trial, the prosecution argued that Salinas's reaction to the question suggested guilt.

///

The <u>Salinas</u> plurality[21] held that there is no Fifth Amendment violation if a witness does not "expressly invoke the privilege against self-incrimination in response to the officer's question." 570 U.S. at 181. "Although 'no ritualistic formula is necessary in order to invoke the privilege,' a witness does not do so by simply standing mute." <u>Id.</u> (quoting <u>Quinn v. United States</u>, 349 U.S. 155, 164 (1955)). "A suspect who stands mute has not done enough to put police on notice that he is relying on his Fifth Amendment privilege." <u>Salinas</u>, 570 U.S. at 188.

In response to the argument "that it would be unfair to require a suspect unschooled in the particulars of legal doctrine to do anything more than remain silent in order to invoke his 'right to remain silent,'" the plurality declared that "popular misconceptions notwithstanding, the Fifth Amendment guarantees that no one may be 'compelled in any criminal case to be a witness against himself'; it does not establish an unqualified 'right to remain silent.' A witness' constitutional right to refuse to answer questions depends on his reasons for doing so, and courts need to know those reasons to evaluate the merits of a Fifth Amendment claim." <u>Salinas</u>, 570 U.S. at 189 (citing <u>Hoffman v. United States</u>, 341 U.S. 479, 486–87 (1951)). For example, the plurality noted that while "someone might decline to answer a police officer's question in reliance on his constitutional privilege . . . he also might do so because he is trying to think of a good lie, because he is embarrassed, or because he is protecting someone else." <u>Salinas</u>, 570 U.S. at 189.

Here, the California Court of Appeal found that Petitioner "did not expressly invoke his right to silence" and rejected his argument pursuant <u>Salinas</u>. <u>Soojian</u>, 2014 WL 7340275, at *26. Unlike the petitioner in <u>Salinas</u> who "simply st[ood] mute," Petitioner: (1) responded with "No" when Detective Oh asked if Petitioner wanted to talk with him, (2) stated that he did not want to answer the question of whether he was home that morning, and (3) stated "I don't want to answer any more questions" when Detective Oh advised Petitioner that Petitioner's truck was involved in a crime. (1 RT 62–64, 124). Even if this distinction rendered the California Court of Appeal's

---

[21] Justice Alito's plurality opinion was joined by Chief Justice Roberts and Justice Kennedy. Justice Thomas filed a concurring opinion, in which Justice Scalia joined, stating that "Salinas' claim would fail even if he had invoked the privilege because the prosecutor's comments regarding his precustodial silence did not compel him to give self-incriminating testimony." <u>Salinas</u>, 570 U.S. at 192 (Thomas, J., concurring).

decision an unreasonable determination of facts or an unreasonable application of Salinas,[22] Petitioner would not be entitled to habeas relief.

The Ninth Circuit has held that use of pre-arrest, pre-Miranda silence as substantive evidence of guilt does "not offend [a defendant]'s privilege against self-incrimination under the Fifth Amendment or his right to due process under the Fourteenth Amendment." United States v. Oplinger, 150 F.3d 1061, 1067 (9th Cir. 1998), overruled in part on other grounds by United States v. Contreras, 593 F.3d 1135 (9th Cir. 2010) (en banc). Accord United States v. Giese, 597 F.2d 1170, 1197 (9th Cir. 1979) ("[N]either due process, fundamental fairness, nor any more explicit right contained in the Constitution is violated by the admission of the silence of a person, not in custody or under indictment, in the face of accusations of criminal behavior."). Accordingly, Petitioner is not entitled to habeas relief on this ground.

### 3. Judicial Estoppel

In the traverse, Petitioner asserts that his fourth ground for relief is incorrectly characterized as "erroneous admission of evidence – Miranda error" rather than as an issue of "judicial estoppel." (ECF No. 44 at 30). Petitioner alleges that the trial court committed judicial estoppel by holding a 402 hearing[23] before the second trial to determine whether Petitioner was "in custody" despite the issue having already been decided during the first trial. (ECF No. 44 at 35–36).

The Court "must construe pro se habeas filings liberally." Allen v. Calderon, 408 F.3d 1150, 1153 (9th Cir. 2005) (citing Maleng v. Cook, 490 U.S. 488 (1989)). To the extent that Petitioner asserts that the trial court failed to judicially estop the prosecution from assuming contrary positions in the first and second trials or failed to follow the law of the case doctrine, the Court finds that these claims are not cognizable in federal habeas corpus. Judicial estoppel is "an

---

[22] It is unclear whether Salinas is "clearly established" for purposes of § 2254. The Ninth Circuit has held that courts "take as 'clearly established' for purposes of § 2254 the 'narrowest' opinion in a fractured majority. Reyes v. Lewis, 833 F.3d 1001, 1028 (9th Cir. 2016) (citing Marks v. United States, 430 U.S. 188, 193 (1977); Panetti v. Quartermann, 551 U.S. 930, 949 (2007)). "Stated differently, a fractured Supreme Court opinion binds us 'only . . . when a majority of the Justices agree upon a single underlying rationale and one opinion can reasonably be described as a logical subset of the other.'" Reyes, 833 F.3d at 1028 (quoting United States v. Davis, 825 F.3d 1014, 1022 (9th Cir. 2016) (en banc)).

[23] "[T]he court shall hear and determine the question of the admissibility of a confession or admission of the defendant out of the presence and hearing of the jury if any party so requests." Cal. Evid. Code § 402(b).

equitable doctrine invoked by a court at its discretion," <u>New Hampshire v. Maine</u>, 532 U.S. 742, 750 (2001) (internal quotation marks and citation omitted), and the law of the case doctrine "simply expresses common judicial practice," <u>Castro v. United States</u>, 540 U.S. 375, 384 (2003) (internal quotation marks and citation omitted). Thus, a state court's failure to employ judicial estoppel or to adhere to the law of the case doctrine does not implicate federal constitutional rights. Accordingly, Petitioner is not entitled to federal habeas relief on these grounds.

Based on the foregoing, Petitioner is not entitled to habeas relief on his fourth claim, and it should be denied.

### C. Third-Party Misconduct Evidence

In his fifth and sixth claims for relief, Petitioner asserts that evidence of third-party misconduct was erroneously admitted and the prosecutor improperly used said evidence to support an inference of guilt by association. (ECF No. 1 at 3–4; ECF No. 1-1 at 49). Respondent argues that the state court reasonably rejected these claims. (ECF No. 20 at 46). These claims were raised on direct appeal to the California Court of Appeal, Fifth Appellate District, which denied the claims in a reasoned decision. The California Supreme Court summarily denied the petition for review. As federal courts review the last reasoned state court opinion, the Court will "look through" the California Supreme Court's summary denial and examine the decision of the California Court of Appeal. <u>See</u> <u>Brumfield</u>, 135 S. Ct. at 2276; <u>Ylst</u>, 501 U.S. at 806.

In denying Petitioner's third-party misconduct evidence claims, the California Court of Appeal stated:

> The trial court also permitted the prosecutor to introduce evidence that someone, perhaps Soojian's father, tampered with evidence in an attempt to assist Soojian's defense. Soojian contends the trial court erred when it overruled his objection to the testimony.
>
> To understand this argument we must go back to the previous appeal. In the second appeal, we ruled that Soojian was entitled to a new trial because exonerating evidence discovered after the initial trial suggested someone other than Soojian may have been responsible for the crime. Specifically, the defense located and purchased the pickup Bolin owned at the time of the crimes. A subsequent search of the pickup (three years after the crime) resulted in the discovery of Joyce's driver's license concealed in the pickup. This evidence was introduced during this trial. In addition, evidence was introduced that Bolin's pickup was stored for two days at the Soojian family property before it was searched.

The prosecutor chose to attack this evidence as having been planted by the Soojian family. This attack was conducted in two ways. First, the prosecution learned in 2011 (seven years after the crime) from Soojian's ex-wife that Soojian had built a hidden room in his mobilehome. This room was built behind the master bedroom closet and was used by Soojian to grow marijuana. At the time of the search, the only items recovered from the room were papers that appeared to belong to Soojian and an ammunition box. Although Soojian claims (without explanation) this evidence was "[u]nduly prejudicial," we fail to see any prejudice that could arise from this evidence. Soojian did not suggest he was unaware of the hidden room, which would have been difficult since several witnesses testified he built it. The real value of this testimony was it permitted the argument that the other items taken from Joyce, and the weapon used in the attack, could have been hidden in this room when the mobilehome was searched in 2004.

The second and main thrust of Soojian's argument deals with the alteration of a document by an unidentified individual in an attempt to place the work order in Bolin's possession before the attack. As explained above, the torn work order was the first piece of evidence that tied Soojian to the attack, and the discovery in Soojian's truck of the piece of the work order that had been torn off the piece found at the crime scene was significant evidence of Soojian's guilt.

The sequence of events leading to the discovery of the alteration starts with the defense's presentation of the altered document to the prosecution as potential exonerating evidence.[24] The prosecution then served a search warrant on the Soojian family tile business to obtain a copy of the hard drives from the computers used in the business. As detailed in our summary of facts, the prosecution's witnesses were able to establish that the document recently had been altered by someone to suggest Bolin's involvement in the Flanagan project. Upon learning of the alteration, the defense immediately withdrew the document from potential trial evidence.

During trial, the prosecution offered the document as evidence. The prosecution's theory was the alteration showed someone in the Soojian family was willing to fabricate evidence in an effort to prevent a conviction. According to the prosecution, the willingness to fabricate evidence strongly suggested the Soojian family members were not credible witnesses and also strongly suggested Joyce's driver's license may well have been placed in Bolin's pickup by someone in the Soojian family.

The trial court agreed with the prosecution's analysis and overruled defense objections to introduction of the altered document. We also agree with the prosecution's analysis. The altered document was strong evidence the Soojian family would fabricate evidence and thus were not credible witnesses. The willingness to fabricate evidence also provided an alternative explanation for the presence of Joyce's driver's license in Bolin's pickup. Accordingly, the evidence was relevant and admissible.

"An attempt to fabricate evidence may manifest a defendant's consciousness of guilt, but only if the attempt was made by the defendant or by another with the defendant's knowledge or authorization." (*People v. Nelson* (2011) 51 Cal.4th 198, 214.) Soojian argues that the evidence should have been excluded because he did not, and could not, have participated in either planting the driver's license in

---

[24] There is no evidence, and we are not suggesting, that defense counsel was aware the document was altered when he presented it to the prosecution.

Bolin's pickup or altering the work order because he was in custody when both events occurred.

Soojian's argument misses the point. The evidence was not offered to prove a consciousness of guilt, but was offered to prove that Joyce's driver's license could have been placed in Bolin's truck by someone in Soojian's family and to attack the credibility of the Soojian family. These were the inferences argued by the prosecutor during closing arguments. Soojian has not cited any portion of the closing argument during which the prosecutor argued the jury could infer Soojian was guilty because of these pieces of evidence. The rule cited by Soojian is inapplicable, and the trial court did not err in admitting the evidence.

Soojian, 2014 WL 7340275, at *26–27 (footnote in original).

1. Admission of Evidence

"The admission of evidence does not provide a basis for habeas relief unless it rendered the trial fundamentally unfair in violation of due process." Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir. 2009) (internal quotation marks omitted) (quoting Johnson v. Sublett, 63 F.3d 926, 930 (9th Cir. 1995)). The petitioner in Holley was charged with multiple felony counts of lewd and lascivious acts on a child under fourteen and challenged the trial court's admission of a lewd matchbook and several sexually explicit magazines seized from the petitioner's bedroom. 568 F.3d at 1096. The Ninth Circuit denied habeas relief because the Supreme Court "has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ [of habeas corpus]." Id. at 1101. "Absent such 'clearly established Federal law,'" the Holley court could not "conclude that the state court's ruling was an 'unreasonable application.'" Id. (quoting Carey v. Musladin, 549 U.S. 70, 77 (2006)).

Petitioner contends that the introduction at trial of the altered document violated due process because it "was irrelevant to guilt, time-consuming, prejudicial and had an unbalanced role in the jury deliberations causing more prejudicial effect than probative value." (ECF No. 1-1 at 54). There is no Supreme Court holding that establishes the fundamental unfairness of admitting irrelevant or overtly prejudicial evidence. Holley, 568 F.3d at 1101. Thus, the California Court of Appeal's determination regarding the admissibility of the altered document was not contrary to, or an unreasonable application of, clearly established federal law, nor was it based on an unreasonable determination of fact. The state court's decision was not "so lacking in

justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." <u>Richter</u>, 562 U.S. at 103. Accordingly, Petitioner is not entitled to habeas relief on his fifth claim, and it should be denied.

2. <u>Prosecutorial Misconduct</u>

In <u>Darden v. Wainwright</u>, 477 U.S. 168 (1986), the Supreme Court held that a prosecutor's improper comments violate the Constitution if they "so infected the trial with unfairness as to make the resulting conviction a denial of due process." 477 U.S. at 181 (quoting <u>Donnelly v. DeChristoforo</u>, 416 U.S. 637, 643 (1974)). <u>See</u> <u>Parker v. Matthews</u>, 567 U.S. 37, 45 (2012) (finding <u>Darden</u> to be the clearly established federal law relevant to prosecutor's improper comments). As "the appropriate standard of review for such a claim on writ of habeas corpus is 'the narrow one of due process, and not the broad exercise of supervisory power,'" it "is not enough that the prosecutors' remarks were undesirable or even universally condemned." <u>Darden</u>, 477 U.S. at 181 (citations omitted). In order to make a determination, the Court is to consider the comment in the context of the entire trial. <u>Hein v. Sullivan</u>, 601 F.3d 897, 913 (9th Cir. 2010) (citing <u>Darden</u>, 477 U.S. at 182).

Petitioner challenges the following statements made by the prosecutor during his closing argument:

> And ladies and gentlemen, there's no evidence that anybody else had that document. You heard a lot of people saying, "Oh, documents go here, documents go there," from defense, but not a single person said somebody else had that document. But more importantly, we know that the Soojian family will forge documents to try to deceive you into thinking other people had that document, because we presented proof of that to you. They presented a document to use in court to try to say Aaron had that document. That was the whole point of that, to put this document in Aaron's hands, but it was forged, and it was clearly forged. They took a quote for Deborah Quinn, somebody went in and changed things and changed things and changed things until it appeared to be a quote from Aaron with that beautiful little language at the bottom, putting it  in Aaron's hands, "Christina, finish quantities. We do plumbing. Have Aaron look at appliances. Possible problem." A forged document trying to point blame at somebody other than the man who did it. But what was more interesting than anything, is when they were caught forging the document related to Aaron, Aaron was their fall guy, what happens? Aaron comes in and is their star witness. Aaron says, "I saw those officers poking around inside that truck. They were poking their heads in there." Why? Why would he say that now? Because they have to explain the DNA— Joyce's DNA inside the truck. That's the only reason.
>
> . . .

53

> The Flanagan quote was found at the crime scene, and despite attempts by the Soojian family to plant evidence or shift that around, it sits right on his shoulders.
>
> . . .
>
> Now, this is the same mom who on our altered document, hers is the log-in. Now, can we say 100 percent she did it? No. Can we way it had to be somebody at the business who had access to the computers? Yeah. Can we say, it had to be somebody who knew how to use the computer—the system from 2004, you know, like somebody, an owner, who's been there forever? Yeah. Can we say that the misspelling of the name, let's think about that one for a second. We're asked to believe somebody who doesn't know how to spell Tannen's name cares so much for him they're going to go into this old computer system, figure it out, alter a document, submit it to Court, but they don't even know how to spell his name. That's ridiculous. It's somebody who's trying to make it appear somebody else altered the document, but somebody who doesn't even know how to spell his name is sure not going to care enough to go present a fake document to the Court.

(25 RT 6039–40, 6041, 6137–38).

"The government's closing argument is that moment in the trial when a prosecutor is compelled to reveal her own understanding of the case as part of her effort to guide the jury's comprehension." <u>Gautt v. Lewis</u>, 489 F.3d 993, 1013 (9th Cir. 2007). "Counsel are given latitude in the presentation of their closing arguments, and courts must allow the prosecution to strike hard blows based on the evidence presented and *all reasonable inferences therefrom.*" <u>Ceja v. Stewart</u>, 97 F.3d 1246, 1253–54 (9th Cir. 1996) (emphasis added). Here, the prosecutor was not arguing that the jury could infer guilt based on the altered document. Rather, the prosecutor attacked the credibility of Petitioner's family based on the altered document. Moreover, prior to the prosecutor's closing argument, the jury was instructed:

> You must decide what the facts are. It is up to all of you and you alone to decide what happened based only on the evidence that has been presented to you in this trial.
>
> . . .
>
> You must decide what the facts are in this case. You must use only the evidence that was presented in the courtroom. Evidence is the sworn testimony of witnesses, the exhibits admitted into evidence and everything else I told you to consider as evidence. Nothing that the attorneys say is evidence. In their opening statements and closing arguments, the attorneys discuss the case, but their remarks are not evidence.

(25 RT 6013, 6016).

///

In light of this context, the prosecutor's comments did not "so infect[] the trial with unfairness as to make the resulting conviction a denial of due process." <u>Darden</u>, 477 U.S. at 181. The state court's decision was not contrary to, or an unreasonable application of, clearly established federal law, nor was it based on an unreasonable determination of fact. The decision was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." <u>Richter</u>, 562 U.S. at 103. Accordingly, Petitioner is not entitled to habeas relief on his sixth claim, and it should be denied.

## D. Identification Procedures

In his eighth claim for relief, Petitioner asserts that the suggestive identification procedures used in his case violated due process. (ECF No. 1 at 4; ECF No. 1-1 at 60). Petitioner argues that his photograph was a different size and had a different background color than the other photographs used in the lineup. (ECF No. 1-1 at 65). Respondent argues that the state court reasonably rejected this claim. (ECF No. 20 at 49).

This claim was raised on direct appeal to the California Court of Appeal, which denied the claim in a reasoned decision. The California Supreme Court summarily denied Petitioner's petition for review. As federal courts review the last reasoned state court opinion, the Court will "look through" the California Supreme Court's summary denial and examine the decision of the California Court of Appeal. <u>See</u> <u>Brumfield</u>, 135 S. Ct. at 2276; <u>Ylst</u>, 501 U.S. at 806.

In denying Petitioner's due process claim regarding the identification procedures, the California Court of Appeal stated:

> Soojian argues the photo lineup in which Joyce identified him as the perpetrator was unduly suggestive. The trial court denied his motion to suppress the identification. Soojian contends the trial court erred in this respect and, as a result of this initial error, Joyce's in-court identification of him also was tainted. We conclude there was no error.
>
> " 'Due process requires the exclusion of identification testimony only if the identification procedures used were unnecessarily suggestive and, if so, the resulting identification was also unreliable.' [Citation.] The question is not whether there were differences between the lineup participants, but 'whether anything caused defendant to "stand out" from the others in a way that would suggest the witness should select him.' [Citation.] We independently review 'a trial court's ruling that a pretrial identification procedure was not unduly suggestive.' [Citation.]" (*People v. Avila* (2009) 46 Cal.4th 680, 698–699.)

To support his argument that the photo lineup was unduly suggestive so that his photo stood out from the others, Soojian points to two items. The first is the background color of the photograph. The photos each have a different background color. In five of the photographs the background color is a shade of white or gray. In Soojian's photo (No. 4), the background color is a light blue. The second distinction involves the size of the photographs. The photograph of Soojian is slightly smaller (approximately one-sixteenth inch shorter on top and bottom) than the photographs of the other individuals in the lineup.

We have reviewed the photo lineup, which was entered into evidence at trial. While Soojian focuses on the differences in the photographs, we note the similarities. Each photograph shows a light-complexioned White male with various hair styles and various amounts of facial hair. The background color in each photograph is different. While the background color in Soojian's photo is somewhat more colorful, this hardly suggests the person viewing the lineup should pick that photograph over the others. Moreover, the size difference identified by Soojian is so minimal as to be insignificant. In other words, we agree with the trial court that these differences do not cause the lineup to be unnecessarily suggestive. Accordingly, the trial court did not err in denying Soojian's motion to suppress.

Soojian, 2014 WL 7340275, at *27–28.

In Simmons v. United States, the Supreme Court held that "convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." 390 U.S. 377, 384 (1968). The Supreme Court also instructed that "each case must be considered on its own facts." Id. The Court finds that the state court's determination that the difference in background color and size did not render the photographic identification procedure impermissibly suggestive was not objectively unreasonable. See Dunson v. Lopez, 428 F. App'x 692, 693 (9th Cir. 2011) (finding that Simmons' "high standard is not met simply because [petitioner's] photograph had a different background color than the rest"). The state court's decision was not contrary to, or an unreasonable application of, clearly established federal law, nor was it based on an unreasonable determination of fact. The decision was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter, 562 U.S. at 103. Accordingly, Petitioner is not entitled to habeas relief on his eighth claim, and it should be denied.

///

me
**V.**

**RECOMMENDATION**

Accordingly, the Court HEREBY RECOMMENDS that the petition for writ of habeas corpus be DENIED.

This Findings and Recommendation is submitted to the assigned United States District Court Judge, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within **THIRTY (30) days** after service of the Findings and Recommendation, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation." Replies to the objections shall be served and filed within fourteen (14) days after service of the objections. The assigned District Judge will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636(b)(1)(C). The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Wilkerson v. Wheeler, 772 F.3d 834, 839 (9th Cir. 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:  __June 24, 2018__                    _____

UNITED STATES MAGISTRATE JUDGE